**TRANSCONTINENTAL INSURANCE COMPANY, Appellant,**

v.

**Joyce CRUMP, Appellee.**

**No. 14–06–00905–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 26, 2008.

Rehearing Overruled Nov. 20, 2008.

---

David L. Brenner, Austin, for appellant.

Peggy M. Campbell, Peter Michael Kelly, Thomas James Barnes, Houston, for appellee.

Panel consists of Justices YATES, ANDERSON, and BROWN.

## OPINION

JOHN S. ANDERSON, Justice.

In this worker's compensation death benefits judicial review proceeding, appellant, Transcontinental Insurance Company, appeals a judgment in favor of appellee, Joyce Crump. Finding no error, we affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Appellee was married to Charles Crump, a longtime employee of Frito Lay. Mr. Crump worked in the packaging department at Frito Lay and on May 9, 2000, while training another employee, he struck his right knee on a tape dispensing machine. Because his knee injury occurred at work, Mr. Crump sought, and received, workers' compensation benefits from appellant. Beginning with his workplace knee injury, Mr. Crump's physical condition began a downward spiral until he died on January 23, 2001, only eight months after the injury. The overarching dispute in this appeal is whether Mr. Crump's May 9, 2000 knee injury was a producing cause of his death.

### A. Mr. Crump's Medical History Prior to May 9, 2000

Mr. Crump received a kidney transplant in 1975. To help prevent his body from rejecting the transplanted kidney, Mr. Crump was prescribed immunosuppressant drugs. While these drugs helped his body to not reject his transplanted kidney, they also made it less likely he would be able to resist an infection if it should occur. In addition, in 1978, Mr. Crump contracted meningitis, and in 1994, Mr. Crump had his gallbladder removed. Despite these medical issues, appellee testified that before Mr. Crump's May 9, 2000 work injury, he was healthy, active, had no problems, and, with the exception of his gallbladder

surgery, rarely missed a day from work. Appellee also testified neither she nor her husband were aware he had hepatitis C or any liver or kidney problems. Both medical doctor expert witnesses who testified also confirmed Mr. Crump's medical records did not reveal, besides his transplanted kidney and immunosuppressant therapy, any medical issues immediately prior to the May 9, 2000 workplace injury.

## B. Mr. Crump's Medical History From May 9, 2000 Until His Death

After striking his right knee on the tape machine, Mr. Crump came home and was in some pain. According to appellee, Mr. Crump complained his leg was bothering him and he laid around more than normal. Because his leg continued to bother him and he was running a fever, Mr. Crump went to Dr. Khalid Chaudhary about his leg injury on May 15, 2000. Dr. Chaudhary diagnosed a contusion to the right knee and a large hematoma[1] on the inside area of the knee and lower thigh. Dr. Chaudhary prescribed analgesics and antibiotics. With this initial visit to Dr. Chaudhary, Mr. Crump began an eight month medical odyssey that included at least eighty days in three different hospitals, continuous treatment with antibiotics, and finally ended with his death on January 23, 2001.

Mr. Crump saw Dr. Chaudhary three more times because his knee injury would not resolve. On June 6, 2000, because Mr. Crump was complaining of fever and burning pain in his right leg, Dr. Chaudhary, concerned a secondary infection had developed in the contused area of Mr. Crump's right leg, referred him to Dr. Camille George, an orthodpedic doctor.

Mr. Crump saw Dr. George the next day. Mr. Crump complained of increased pain, swelling, fever, and warmth in his right leg and ankle. Upon examining Mr. Crump, Dr. George noted extensive swelling and warmth along his inner thigh, calf, and ankle. Her impression was Mr. Crump had cellulitis[2] of the right thigh, the same area where the May 9th injury occurred. After conservative treatment failed, on June 14, 2000, Dr. George recommended immediate hospitalization for the administration of intravenous antibiotics and blood cultures.

Mr. Crump was admitted to Polly Ryon Hospital on June 14, 2000, where he remained until he was transferred to Memorial Southwest Hospital on June 23, 2000, for additional investigation. At the time he was transferred to Memorial Southwest, the doctors diagnosed Mr. Crump with cellulitis of both legs, hepatitis C,[3] a history of kidney transplant, renal insufficiency, and hemochromatosis.[4] Mr. Crump was hospitalized at Memorial Southwest from June 23 until June 26, 2000. At Memorial Southwest, the doctors thought Mr. Crump had a broad, opportunistic infection. According to Dr. John Daller, a transplant surgeon and one of Mr. Crump's many treating physicians, opportunistic infections tend to develop in people who are immunosuppressed. Organisms such as bacteria, fungi, or viruses that a normal person would not have a

1. A hematoma is a bruise where you have bleeding into soft tissue.

2. Cellulitis is a skin inflammatory infectious disease process.

3. Hepatitis C is a viral infection that primarily affects the liver. It is a very indolent, chronic infection that can be quiescent and not cause any clinical problems in some people, but in others it can be a slowly progressive disorder that leads to scarring of the liver and cirrhosis. Hepatitis C can be lethal.

4. Hemochromatosis is an iron storage disease in the liver.

problem with, can make an immunosuppressed person very sick. Dr. Daller also explained the fact a person, such as Mr. Crump, is on immunosuppression therapy can delay the proper diagnosis of an infection. According to Dr. Daller, because a person's immune system is suppressed, the person's body does not react the way a normal person's would and it does not immediately produce pus in the infected area. Thus, the immunosuppression drugs can mask not only the existence of an infection, but also the severity of the infection.

On June 26, 2000, Mr. Crump was transferred to the University of Texas Medical Branch, Galveston ("UTMB") where Dr. Daller had agreed to treat him. At the time he was transferred, the physicians at Memorial Southwest believed Mr. Crump had sepsis or a body-wide infection with persistent fever. The Memorial Southwest doctors believed the source of the sepsis was Mr. Crump's lungs. On July 3rd, a blood culture showed Mr. Crump had a yeast infection, a type of fungal infection. So, in addition to the cellulitis in his right leg, Mr. Crump was now suffering from a yeast infection in his blood. According to Dr. Daller, with an immunosuppressed patient, the effort is to keep the patient balanced between sufficient immunosuppression to avoid rejection of the transplanted organ and, at the same time, avoid infection. When the immunosuppressed patient becomes infected, the balance is tipped and it can lead to worsening organ function. To deal with the yeast infection, Dr. Daller prescribed amphotericin B infusions.[5] Dr. Daller also testified that, other than the immunosuppression

drug therapy, he was not aware of any ongoing health problems Mr. Crump might have been experiencing prior to this May 9th knee injury. When UTMB discharged Mr. Crump on July 13, 2000, he still had cellulitis of his lower right leg, an infection of the blood from yeast, and there was concern the leg infection might include the yeast infection. Also, because of his critical illness (he had spent time in the intensive care unit at UTMB), Mr. Crump suffered a period of renal failure and his liver function had deteriorated because of his infection.

Following his discharge on July 13th, Mr. Crump went back to UTMB from July 22 through July 25, 2000, for angina-like chest pain and again from July 28 until August 4, 2000. During the late July hospitalization, Dr. Steve Weinman, a gastroenterologist, examined Mr. Crump. According to Dr. Weinman, Mr. Crump appeared to be a case of decompensation of HCV-associated cirrhosis of the liver[6] which was triggered by his recent bout of sepsis/fungemia. According to Dr. Daller, Mr. Crump had chronic liver disease but was functioning well with it before the May 9th knee injury. But, once Mr. Crump injured his knee and developed the infection in his leg, this caused a decompensation, or worsening, of his liver disease.

On September 16, 2000, UTMB admitted Mr. Crump because of swelling in his right lower leg. He would not be discharged until October 3, 2000. During this hospitalization, Dr. Daller determined Mr. Crump had developed an abscess in the area of the May 9th injury. On September 26, 2000, Dr. Daller took Mr. Crump to the

---

5. A potential side effect of amphotericin B is renal toxicity.

6. Cirrhosis of the liver is a process where an agent, which can be viral in nature, drugs, or autoimmune processes, damages the liver.

The end result of cirrhosis is a scarring of the normal liver tissue, which reduces its proper functioning. Cirrhosis is a process that usually develops over a long period of time.

operating room where he made an incision and drained purulent material and obtained blood cultures. Because of concern over the possible existence of infection in the wound, Dr. Daller left the wound open to heal from the inside out. This wound had still not healed when Mr. Crump died nearly four months later. The blood cultures taken from Mr. Crump's thigh grew out as histoplasmosis. Histoplasmosis is an airborne fungus endemic to certain areas, including large portions of Texas. A person is normally exposed to the fungus by breathing it, and the fungus then colonizes the lungs and becomes resident flora. Most people exposed to histoplasmosis never develop an infection or any other symptoms; however, people with suppressed immune systems, such as Mr. Crump, are more likely to develop an infection once exposed. Even in people who are immune suppressed, once exposed, they can go years without an infection developing because, according to Dr. Daller, histoplasmosis usually requires a triggering event for an infection to develop. Dr. Daller opined Mr. Crump's May 9th knee injury served as that triggering event. Also, it is possible for the histoplasmosis infection to spread through the body either through the blood or the lymphatic system. Finally, cellulitis can be a side effect of a blood borne infection.

Mr. Crump entered UTMB again between October 13 and October 20, 2000, because of persistent fever and sinus pain. He also went to the Polly Ryon Hospital Emergency Room on October 22, 2000, with a nose bleed. UTMB admitted Mr. Crump again from November 6 until November 18, 2000, because he was experiencing seizures. When UTMB discharged Mr. Crump, his infection had still not re-

solved as he was taking amphotericin B, an anti-fungal agent, and vancomycin, an antibiotic. The doctors also instructed Mr. Crump to continue changing the dressing on the debridement procedure wound in his leg. Mr. Crump visited a UTMB clinic on January 10, 2001 complaining of back pain.

On January 22, 2001, appellee took Mr. Crump to the Polly Ryon Hospital emergency room. Mr. Crump went to the emergency room with complaints of pain in his right lower back and vomiting. It was also noted Mr. Crump had been running a high fever and was disoriented for several days before coming to the hospital. One of the doctors treating Mr. Crump noted he had been sick since May 2000 with an infection in his right leg. The Polly Ryon medical records also indicate Mr. Crump was experiencing very low blood pressure. While still in the emergency room, Mr. Crump vomited several times and had to be resuscitated. Mr. Crump was transferred to the Intensive Care Unit where he died on January 23, 2001. Mr. Crump was 43 at the time of his death.

Following Mr. Crump's death, the Harris County Medical Examiner performed an autopsy and found that propoxyphene [7] toxicity was the cause of death. According to Dr. Daller, propoxyphene toxicity can be caused in two ways: (1) an overdose, or (2) the failure of the patient's liver to properly metabolize the drug allowing it to build up in the body over time. The medical examiner also made the following pathological findings: (1) propoxyphene toxicity, (2) atherosclerotic cardiovascular disease, (3) chronic renal failure with intact renal transplant and atrophic native kidneys, and (4) liver fibrosis with ascites and hyposplenia. The death certificate lists

7. Propoxyphene is a component of the painkiller Darvocet, which Mr. Crump was receiving.

the cause of death as cardiorespiratory arrest with cirrhosis and ileus.[8]

## C. The Administrative and Trial Proceedings

Contending Mr. Crump's May 9th injury was a producing cause of his death, appellee sought workers' compensation death benefits. On July 11, 2002, the Appeals Panel of the Texas Workers' Compensation Commission (now the Division of Workers' Compensation of the Texas Department of Insurance) affirmed a contested case hearing officer's decision that Mr. Crump's May 9, 2000 work-related injury was a producing cause of his death. Appellant then sought judicial review of the Appeals Panel decision pursuant to chapter 410 of the Texas Labor Code. The party seeking judicial review of the workers' compensation Appeals Panel decision has the burden of proof by a preponderance of the evidence. Tex. Lab.Code Ann. § 410.303 (Vernon 2006). Thus, in seeking judicial review of the Appeals Panel decision, appellant had the burden to prove, by a preponderance of the evidence, that Mr. Crump's May 9, 2000 workplace injury was not a producing cause of his injury.

Prior to trial, appellant sought to exclude the testimony of appellee's medical experts, Dr. Daller. Dr. Daller is a transplant surgeon who treated Mr. Crump during his hospitalizations at UTMB. Appellant argued Dr. Daller's opinion regarding the role Mr. Crump's May 9, 2000 knee injury played in his death was not based on a reliable foundation and should be excluded. The trial court denied appellant's motion.

In addition to appellee, two medical experts testified during the trial: Dr. Daller and Dr. Jason Hunt, appellant's retained medical expert. Dr. Daller, in addition to testifying on the contents and meaning of Mr. Crump's medical records, testified Mr. Crump's work injury was a producing cause of his death because it incited or triggered a series of events that led to his death. In Dr. Daller's opinion, Mr. Crump's knee injury provided the site for the development of an infection, the existence of which was confirmed by blood cultures taken from the injured area, which he was unable to defeat because of the long term effects of his immunosuppressant drug therapy necessitated by his kidney transplant. Dr. Daller further opined this infection negatively impacted the functioning of his organs, including his liver and kidney, which ultimately caused his death.

On direct examination, Dr. Hunt opined Mr. Crump's May 9, 2000 knee injury was not a producing cause of his death. In Dr. Hunt's opinion, Mr. Crump's death was caused by the effects of his chronic health issues including his kidney transplant, hepatitis C, and diabetes. According to Dr. Hunt, Mr. Crump would have died on January 23, 2001, even if he had not injured his knee on May 9, 2000. In forming his opinion, Dr. Hunt relied on (1) the lack of objective medical evidence proving Mr. Crump had a bacterial infection; (2) the autopsy report does not mention cellulitis, histoplasmosis, or the knee injury as a producing cause of the death; (3) the accepted method by which histoplasmosis enters the body is through the lungs and not an injury such as Mr. Crump's knee injury; (4) the fact the four pathological findings listed in the autopsy (propoxyphene toxicity, artherosclerotic cardiovascular disease, chronic renal failure, and liver fibrosis with ascites) are problems or diseases that normally require significant time to negatively impact organ function; (5) his opinion the knee injury would not

---

8. An ileus is a blockage of the intestine.

have directly resulted in the toxic levels of propoxyphene found in Mr. Crump's body during the autopsy; and (6) the death certificate did not include a notation that Mr. Crump's death was the result of a work-related injury.

Following his direct testimony, Dr. Hunt was extensively cross-examined by appellee. During this cross-examination, Dr. Hunt refused to disavow his deposition testimony in which he stated the hematoma and contusion on Mr. Crump's leg may have provided a place for the infection to develop and it was possible the wound site was infected. Dr. Hunt also admitted: (1) there was nothing in the medical records to indicate Mr. Crump was experiencing symptoms associated with hepatitis C, or liver dysfunction, prior to his knee injury; (2) his original opinion was that Mr. Crump died as a result of a heart attack or arrhythmia, but he could not tell if there was any evidence in the autopsy report supporting his original opinion; (3) he could not prove Mr. Crump had a bacterial infection but he also could not prove he did not; (4) Mr. Crump received antibiotic therapy from shortly after his knee injury until his death; (5) Mr. Crump's doctors acted correctly when they treated him for infections even if they could not prove through objective testing that he had a bacterial infection; (6) he never said Mr. Crump's wound was never infected, only that he cannot tell if it was infected; (7) there can be more than one contributing factor to a death; (8) the autopsy report noted Mr. Crump's leg wound was still open and emitting a strong odor; (9) Mr. Crump's knee injury never completely healed before his death; (10) a person can have hepatitis C, liver disease, and kidney problems and not be aware of those issues; (11) the histoplasmosis in Mr. Crump's body was lying dormant prior to his knee injury; (12) a bruise can become infected and the medical records indicate Mr. Crump's doctors suspected the bruise was infected within ten days, the normal time for an infection to develop; and (13) Mr. Crump's wound was a contributing factor to his death.

Finally, both appellant and appellee addressed an error on Dr. Hunt's November 12, 2001 report. In his report, beneath his signature, Dr. Hunt stated he was a board certified transplant surgeon. Dr. Hunt admitted he was not a transplant surgeon. He also admitted he wrote the report and proofread it. Finally, Dr. Hunt testified he did not know how the assertion made it onto his report.

The case was submitted to the jury with a single issue.[9] The jury determined Mr. Crump's May 9, 2000 knee injury was a producing cause of his death. Appellee did not submit the issue of her attorney's fees to the jury and instead, over the objection of appellant, submitted the recovery of attorney's fees to the trial court. The trial court awarded appellee

---

9. The jury question reads:

**QUESTION NO. 1**

You are instructed that the Texas Workers' Compensation Commission found that Charles Crump's compensable right knee injury of May 9, 2000 resulted in his death on January 23, 2001.

"Injury" means damage or harm to the physical structure of the body and a disease or infection naturally resulting from the damage or harm.

"Producing Cause" means an efficient, exciting, or contributing cause that, in a natural sequence, produces the death in question. There may be more than one producing cause.

**WAS CHARLES CRUMP'S MAY 9, 2000 INJURY A PRODUCING CAUSE OF HIS DEATH?**

Answer "Yes" or "No."

**Answer: Yes**

$160,005.23 for attorney's fees and expenses incurred through the completion of the trial. The trial court also awarded appellee $2,812.50 for attorney's fees incurred in the preparation for and participation in the hearing on the recovery of attorney's fees. This appeal followed.

## DISCUSSION

Appellant raises seven issues on appeal which can be divided into three general categories. Issues one and three address the sufficiency of the evidence. In issue two, appellant contends the trial court improperly instructed the jury on producing cause. In issues four through seven, asserting various arguments, appellant challenges the trial court's award of attorney's fees to appellee. We address each category in turn.

## I. Was Dr. Daller's Opinion Reliable?

In its first issue, appellant argues the evidence is legally and factually insufficient to support the jury's verdict. However, appellant's sufficiency challenge is based on the premise Dr. Daller's testimony constitutes no evidence because it was not based on a reliable foundation and was inadmissible, thus making Dr. Hunt's testimony uncontroverted. Therefore, before addressing appellant's first issue, we examine the third issue challenging the reliability of Dr. Daller's expert testimony.

## A. The Standard of Review

■ While evidentiary rulings, including rulings on expert testimony, are normally reviewed for an abuse of discretion, when the trial court admits expert testimony and an appellant challenges the expert testimony as no evidence, we consider whether the expert testimony is reliable under a *de novo* standard of review. *Exxon Corp. v. Makofski*, 116 S.W.3d 176, 182 (Tex.App.–Houston [14th Dist.] 2003, pet. denied); *Mo. Pac. R.R. Co. v. Navarro*, 90 S.W.3d 747, 750 (Tex.App.–San Antonio 2002, no pet.).

## B. Dr. Daller's Causation Opinion Was Based on a Reliable Foundation

Appellant argues Dr. Daller's expert testimony connecting Mr. Crump's May 9, 2000 knee injury to his death in January 2001 constitutes no evidence because it was not based on a reliable foundation. To evaluate the reliability of Dr. Daller's causation opinion, appellant asserts we must apply the six factors first adopted by the Texas Supreme Court in *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex.1995).[10] We disagree.[11]

10. The six *Robinson* factors include: (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the non-judicial uses which have been made of the theory or technique. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995).

11. Appellant, citing to the *Navarro* case, contends Dr. Daller was required to exclude oth-

er plausible causes of Mr. Crump's death with reasonable certainty. *Mo. Pac. R.R. Co. v. Navarro*, 90 S.W.3d 747, 750 (Tex.App.–San Antonio 2002, no pet.). Once again, we disagree. *Navarro* is distinguishable from this case as it was a toxic tort case dependent upon epidemiological expert testimony to establish that exposure to diesel exhaust fumes could cause the plaintiff's bone marrow cancer. *Id.* at 754. In addition, in support of its proposition that an expert must exclude other plausible causes, the *Navarro* court cited *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex.1997), another toxic tort case in which the plaintiff had to rely on epidemiological studies to establish causation. Finally, in a workers' compensation case, the law

Instead of applying the six *Robinson* factors, in this case, where Dr. Daller's opinion was based on his experience and training in his field, we consider whether there is an "analytical gap" between the expert's opinion and the bases on which the opinion was founded. *Taylor v. Am. Fabritech, Inc.* 132 S.W.3d 613, 619 (Tex. App.–Houston [14th Dist.] 2004, pet. denied) (citing *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 727 (Tex. 1998)).

Dr. Daller utilized a differential diagnosis in reaching his conclusions regarding the connection between Mr. Crump's knee injury and his death. A differential diagnosis is a clinical process whereby a doctor determines which of several potential diseases or injuries is causing the patient's symptoms by ruling out possible causes. *Coastal Tankships, U.S.A., Inc. v. Anderson,* 87 S.W.3d 591, 604 (Tex.App.–Houston [1st Dist.] 2002, pet. denied). In a differential diagnosis, a doctor compares a patient's symptoms to symptoms associated with known diseases, conducts physical examinations of the patient, collects data on the patient's history and illness, and then analyzes that data until reaching a final diagnosis and makes a decision on how to properly treat the patient's injury or illness. *Id.* Differential diagnosis is the basic method of internal medicine and enjoys widespread acceptance in the medical community. *Id.* When properly conducted, the technique has important, non-judicial uses and is generally accepted as valid by the medical community and has been subjected to use, peer review, and testing. *Id.* Even with all of the advances of medical science, the practice of medicine remains an art. *Id.* A properly conducted and explained differential diagnosis is not "junk science." *Id.* Medical doctors routinely use differential diagnosis as a sufficient basis on which to prescribe medical treatment with potential life-or-death consequences. *Id.* Even Dr. Hunt agreed Mr. Crump's treating physicians, including Dr. Daller, acted correctly when they used a differential diagnosis to treat Mr. Crump and that he would have handled Mr. Crump's care the same way. In *Coastal Tankships,* the First Court of Appeals determined a causation opinion by a treating physician developed using a differential diagnosis was based on a reliable foundation and was therefore admissible. *Id.* We agree with the First Court of Appeals and hold Dr. Daller's causation opinion, developed through a differential diagnosis while treating Mr. Crump, does not contain an "analytical gap" between his opinion and the bases on which his opinion was founded. Therefore, we hold Dr. Daller's opinion was based on a reliable foundation and was properly admitted into evidence. We overrule appellant's third issue.

## II. Was the Evidence Legally and Factually Sufficient?

In appellant's first issue, appellant contends (1) Dr. Daller's opinion was not based on a reliable foundation and therefore legally constitutes no evidence; (2) making Dr. Hunt's opinion testimony uncontroverted; (3) which makes the evidence legally and factually insufficient to support the jury's verdict.

### A. The Standard of Review

In this judicial review proceeding, appellant, as the party appealing from the workers' compensation Appeals Panel decision, had the burden of proof to establish that

provides there can be more than one producing cause of the compensable injury or death. *See Flores v. Employees Ret. Sys. of Tex.,* 74 S.W.3d 532, 549 (Tex.App.–Austin 2002, pet. denied).

Mr. Crump's May 9, 2000 knee injury was not a producing cause of his death. Tex. Lab.Code Ann. § 410.303.

▇▇▇ In a legal sufficiency review, we view the evidence in the light most favorable to the verdict and indulge every reasonable inference that supports the verdict. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). We must credit evidence that supports the judgment if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See id.* at 807, 827. If the evidence falls within the zone of reasonable disagreement, we cannot substitute our judgment for that of the fact finder. *Id.* at 822. Unless there is no favorable evidence, or if the contrary evidence renders supporting evidence incompetent or conclusively establishes the opposite, we must affirm. *See id.* at 810–11. "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827. When, as in this case, an appellant attacks the legal sufficiency of an adverse finding on an issue for which it had the burden of proof, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001). In reviewing a "matter of law" challenge, the reviewing court must first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* If there is no evidence to support the finding, only then will the reviewing court examine the entire record to determine if the contrary proposition is established as a matter of law. *Id.* The issue should be sustained only if the contrary position is conclusively established. *Id.* Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller,* 168 S.W.3d at 816. Evidence is no more than a scintilla when it is so weak as to do no more than create a mere surmise or suspicion of its existence. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004). The fact finder is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *City of Keller,* 168 S.W.3d at 819.

▇▇▇ In a factual sufficiency review, we consider and weigh all the evidence supporting and contradicting the finding. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). When a party attacks the factual sufficiency of an adverse finding on which it had the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Francis,* 46 S.W.3d at 242. We will set aside the finding only if it so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* The amount of evidence necessary to affirm a judgment is far less than the amount necessary to reverse a judgment. *GTE Mobilnet of S. Tex. v. Pascouet,* 61 S.W.3d 599, 616 (Tex.App.–Houston [14th Dist.] 2001, pet. denied). We are not a fact finder. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998). Accordingly, we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would support a different result. *Id.* If we determine the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict; we need not do so when affirming a jury's verdict. *Gonzalez v. McAllen Med. Ctr., Inc.,* 195 S.W.3d 680, 681 (Tex.2006) (per curiam).

**B. The Evidence is Legally and Factually Sufficient**

The entire foundation of both appellant's legal and factual sufficiency arguments rests upon the contention Dr. Daller's expert testimony was not reliable, was inadmissible, and therefore constitutes no evidence. However, we have already determined Dr. Daller's expert opinion was reliable and was properly admitted by the trial court. Therefore, it must be considered in our sufficiency review.

■ Since appellant had the burden of proof at trial, in our legal sufficiency review, we first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Francis*, 46 S.W.3d at 241. We need look no farther than Dr. Daller's testimony, detailed above, explaining how Mr. Crump's May 9, 2000 knee injury contributed to his death. This constitutes some evidence supporting the jury's finding. We hold the evidence is legally sufficient. For the same reason, we determine the jury's finding is not against the great weight and preponderance of the evidence. Accordingly, the evidence is factually sufficient. We overrule appellant's first issue.

## III. Did the Trial Court Improperly Instruct the Jury on Producing Cause?

In its second issue, appellant contends the trial court improperly defined "producing cause"[12] in the jury charge. We disagree.

### A. The Standard of Review

■ A trial court must submit "such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex.R. Civ. P. 277. A proper jury instruction is one that assists the jury

and is legally correct. *Town of Flower Mound v. Teague*, 111 S.W.3d 742, 759 (Tex.App.–Fort Worth 2003, pet. denied). While this court normally reviews the trial court's decisions as to how to charge the jury under an abuse of discretion standard, once the trial court has decided to define a term in the charge for the jury, this court determines whether the definition misstates the law using a *de novo* standard of review. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 525 (Tex.2003). So long as the charge is legally correct, a trial judge is accorded broad discretion regarding the submission of questions, definitions, and instructions to the jury. *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex.1999). Therefore, we will review the trial court's legally correct definitions, instructions, and questions for an abuse of discretion. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex.2000). We may not reverse a judgment for error in the submission of jury instructions, definitions, or questions unless we conclude the error probably caused the rendition of an improper judgment. *Kiefer v. Cont'l Airlines, Inc.*, 10 S.W.3d 34, 37 (Tex.App.–Houston [14th Dist.] 1999, pet. denied). To determine whether an improper jury charge constitutes reversible error, we consider the pleadings, the evidence, and the charge in its entirety. *Id.*

### B. The Trial Court Properly Defined "Producing Cause"

■ Courts liberally construe workers' compensation legislation to carry out its purpose of compensating injured workers and their dependents. *Albertson's, Inc. v. Sinclair*, 984 S.W.2d 958, 961 (Tex.1999). Because of this liberal inter-

12. Appellant submitted, and the trial court rejected, the following proposed instruction: " 'Producing cause' means that cause, which in a natural and continuous sequence, produces death and without which, the death would not have occurred."

pretation, a workplace accident or disease is considered to be a producing cause even if it is not a substantial factor in bringing about the injury, disability, or illness. *Flores v. Employees Ret. Sys. of Tex.*, 74 S.W.3d 532, 549 (Tex.App.–Austin 2002, pet. denied). Therefore, a workplace injury need not be the sole or primary cause in bringing about the disability or illness; rather, as long as the occupational injury is a producing cause of the disability or illness, there is a sufficient causal link under the workers' compensation scheme. *Id.* An unrelated condition or injury may even be the primary factor in causing an employee's disability or death and still not preclude a recovery of workers' compensation benefits. *Id.* In addition, a pre-existing condition will not preclude compensation under the system as long as a workplace accident contributed to the injury in some amount. *INA of Tex. v. Howeth*, 755 S.W.2d 534, 536–37 (Tex.App.–Houston [1st Dist.] 1988, no writ). It is settled law in Texas that in a workers' compensation case, there may be more than one producing cause of an injury, incapacity, or death. *Marts v. Transp. Ins. Co.*, 111 S.W.3d 699, 703 (Tex.App.–Fort Worth 2003, pet. denied); *Tex. Workers' Comp. Ins. Fund v. Simon*, 980 S.W.2d 730, 736 (Tex.App.–San Antonio 1998, no pet.); *Nat'l Farmers Union Prop. and Cas. Co. v. Degollado*, 844 S.W.2d 892, 897 (Tex.App.–Austin 1993, writ denied); *Tex. Employers' Ins. Assoc. v. Charles*, 381 S.W.2d 664, 668 (Tex.Civ.App.–Texarkana 1964, writ ref'd n.r.e.).

■■■ Here, the trial court defined "producing cause" as "an efficient, exciting, or contributing cause that, in a natural sequence, produces the death in question. There may be more than one producing cause." We conclude this definition accurately states the law as applied to "producing cause" in a workers' compensation case and the trial court did not abuse its discretion when it defined "producing cause" in this manner and rejected appellant's proposed definition.[13] *See Tex. Employers' Ins. Assoc. v. Fuentes*, 597 S.W.2d 811, 812 (Tex.Civ.App.–Eastland 1980, writ ref'd n.r.e.) (approving identical language as an accurate definition of "producing cause" in a workers' compensation case). We overrule appellant's second issue.

## IV. The Texas Constitution Does Not Guarantee a Jury Trial on the Issue of Attorney's Fees in a Workers' Compensation Case

The Texas Constitution provides two guarantees of the right to trial by jury. Article I, section 15 provides: "The right to trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency...." Tex. Const. art. I, § 15. The second provision is found at article V, section 10 and it provides: "In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right of trial by jury...." *Id.* art. V, § 10. In its fourth issue, appellant contends section 408.221 of the Texas Labor Code violates its constitutional right to

---

**13.** After the parties submitted their briefs in this matter, the Texas Supreme Court decided *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex.2007). In *Ledesma*, the Supreme Court determined the correct definition of "producing cause" in a products liability action as being a substantial factor in bringing about an injury, and without which the injury would

not have occurred. *Ledesma*, 242 S.W.3d at 46. We find *Ledesma* distinguishable and inapplicable to this appeal because it is a products liability case which requires the cause to be a substantial factor of the event in issue, a requirement absent from a workers' compensation case.

have a jury resolve the contested issue of appellee's reasonable and necessary attorney's fees. According to appellant, this statute violates both article I, section 15 and article V, section 10 of the Texas Constitution. We disagree.

### A. The Standard of Review

■ When reviewing the constitutionality of a statute, we begin with the presumption that the statute is constitutional. *Walker v. Gutierrez*, 111 S.W.3d 56, 66 (Tex.2003); *See* Tex. Gov't Code Ann. § 311.021(1) (Vernon 2005). The wisdom or expediency of the law is the legislature's prerogative, not ours. *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 520 (Tex.1995).

■ The party challenging a statute's constitutionality has the burden of proving the statute fails to meet constitutional requirements. *Walker*, 111 S.W.3d at 66. In challenging the constitutionality of a statute, a party may show a statute is unconstitutional on its face or as applied to that party. *Garcia*, 893 S.W.2d at 518 n. 16. In this appeal, appellant contends section 408.221 of the Texas Labor Code is unconstitutional on its face; therefore, appellant must show that the statute, by its terms, always operates unconstitutionally. *Id.* at 518.

### B. Does Section 408.221 Violate Article I, Section 15 of the Texas Constitution?

At trial, appellee argued, and the trial court accepted, that section 408.221 of the Texas Labor Code required the trial court to determine the amount of reasonable and necessary attorney's fees appellee was entitled to recover. Appellant contends on appeal this interpretation of section 408.221 violates article I, section 15 of the Texas Constitution. Section 408.221, provides, in pertinent part:

(b) Except as otherwise provided, an attorney's fee under this section is based on the attorney's time and expenses according to written evidence presented to the division or court.

(c) An insurance carrier that seeks judicial review ... of a final decision of the appeals panel regarding compensability or eligibility for, or the amount of, ... death benefits is liable for reasonable and necessary attorney's fees ... incurred by the claimant as a result of the insurance carrier's appeal if the claimant prevails on an issue on which judicial review is sought.... If the carrier appeals multiple issues and the claimant prevails on some, but not all, of the issues appealed, the court shall apportion and award fees to the claimant's attorney only for the issues on which the claimant prevails. In making that apportionment, the court shall consider the factors prescribed by Subsection (d).

Tex. Lab.Code Ann. § 408.221 (Vernon 2006).

■ Article I, section 15 provides the right to a jury trial for those actions or analogous actions which were tried by a jury when the Texas Constitution was adopted in 1876. *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 636 (Tex.1996). Therefore, article I, section 15 only applies if, in 1876, a jury would have been allowed to try the action or analogous action. *Id.* The Workers' Compensation Act is a substitute for the common law negligence remedy, which was an action tried to a jury in 1876. *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 527 (Tex.1995). Therefore, at least with regard to the recovery of income and death benefits, the Workers' Compensation Act is analogous to a claim for which the right to a jury trial is constitutionally preserved. *Id.* However, the Supreme Court did not

address the issue of attorney's fees in *Garcia.*

Attorney's fees are not recoverable in a negligence suit. *New Amsterdam Cas. Co. v. Tex. Indus., Inc.,* 414 S.W.2d 914, 915 (Tex.1967). Therefore, statutory provisions providing for the recovery of attorney's fees in a negligence or analogous action, are in derogation of the common law. *Id.* Because there was no common law action to recover attorney's fees under a common law negligence claim, we conclude a claim for attorney's fees brought pursuant to section 408.221 is not an action or analogous action that was tried to a jury in 1876. Accordingly, article I, section 15 does not apply to appellee's action to recover attorney's fees.

**C. Does Section 408.221 Violate Article V, Section 10 of the Texas Constitution?**

Article V, section 10's guarantee of a jury trial does not apply to an appeal from an administrative decision such as appellant's. *Garcia,* 893 S.W.2d at 527.

Because article I, section 15, and article V, section 10 do not apply to appellee's action to recover attorney's fees pursuant to section 408.221, the trial court's denial of appellant's request for a jury trial cannot violate those constitutional provisions. We overrule appellant's fourth issue.

**V. Appellee Did Not Waive Her Claim for Attorney's Fees**

In issue five, appellant contends appellee waived her claim for attorney's fees when she failed to submit the issue of her reasonable and necessary attorney's fees to the jury for resolution. Once again, we disagree.

**A. The Standard of Review**

The availability of attorney's fees under a particular statute is a question of law for the court. *Holland v. Wal–Mart Stores, Inc.,* 1 S.W.3d 91, 94 (Tex.1999). Therefore, we review this issue *de novo. El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,* 8 S.W.3d 309, 312 (Tex.1999).

We construe statutory provisions to ascertain and effectuate legislative intent, and we ascertain that intent by first looking to the plain and common meaning of the statute's words. *Tex. Mut. Ins. Co. v. Sonic Sys. Int'l, Inc.,* 214 S.W.3d 469, 476 (Tex.App.–Houston [14th Dist.] 2006, pet. denied). We must also view a statute's terms in context and give them full effect. *Id.* When examining the provisions within the Texas Workers' Compensation Act, we should keep in mind the comprehensive nature of the Act. *Id.* If the meaning of the statutory language is unambiguous, a court must interpret it according to its terms consistent with other provisions in the statute. *Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004). A court also considers the objective the law seeks to obtain and the consequences of a particular construction. *Id.* In our construction, we must presume the entire statute is intended to be effective, a just and reasonable result is intended, a result feasible of execution is intended, and the public interest is favored over private interest. *See* Tex. Gov't Code Ann. § 311.021 (Vernon 2005); *Compass Bank v. Bent Creek Inv., Inc.,* 52 S.W.3d 419, 424 (Tex.App.–Fort Worth 2001, no pet.). A court reads every word as if it were deliberately chosen and must presume that omitted words were excluded purposefully. *See Cornyn v. Universe Life Ins. Co.,* 988 S.W.2d 376, 379 (Tex.App.–Austin 1999, pet. denied). Construction of a statute that would render a provision useless is not favored by law. *Carson v. Hudson,* 398 S.W.2d 321, 323 (Tex.Civ.App.-Austin 1966, no writ).

## B. Because Section 408.221 States the Trial Court Will Determine the Amount of Attorney's Fees, Appellee Did Not Waive Her Claim

■ By its plain language, section 408.221 provides the amount of attorney's fees will be determined by the trial court according to the written evidence submitted to it. Tex. Lab.Code Ann. § 408.221(b). If we were to accept appellant's argument that a workers' compensation claimant must submit the issue of attorney's fees sought pursuant to section 408.221 to the jury, we would render a large portion of the statute's language meaningless. Therefore, because appellee was not required to submit the issue of her reasonable and necessary attorney's fees to the jury for resolution, she did not waive her claim for attorney's fees when she did not do so. We overrule appellant's fifth issue.

## VI. Appellant Waived Its Issue On Appeal Contending It Was Entitled to a Plenary Hearing on Appellee's Attorney's Fees

In its sixth issue, appellant argues appellee waived her claim for attorney's fees because she did not present live testimony at a plenary hearing. We do not reach the merits of this issue because appellant waived its claim of waiver.

■ To preserve error, a timely, specific objection must be made. Tex.R.App. P. 33.1(a). Rule 33.1(a) requires not only that a party act timely when objecting, but also state with sufficient specificity the grounds for the objection so the trial court can act on the objection. *Hoxie Imple-*

*ment Co. v. Baker,* 65 S.W.3d 140, 145 (Tex.App.–Amarillo 2001, pet. denied). In addition, to preserve error, a party's argument on appeal must comport with its argument to the trial court. *Wohlfahrt v. Holloway,* 172 S.W.3d 630, 639–40 (Tex. App.–Houston [14th Dist.] 2005, pet. denied).

In this issue, appellant argues it was entitled to a plenary hearing where the trial court would hear live testimony on the issue of attorney's fees. *See Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 269 (Tex.1992) (explaining a plenary hearing is a hearing at which witnesses present sworn testimony in person or by deposition rather than by affidavit). However, the only objection appellant lodged with the trial court on its handling of appellee's attorney's fees was an objection that it was entitled to a jury trial on that issue.[14] This is, of course, a different basis than appellant's argument on appeal in this issue. Accordingly, appellant waived this issue on appeal. Tex.R.App. P. 33.1; *Wohlfahrt,* 172 S.W.3d at 639–40. We overrule appellant's sixth issue.

## VII. Appellee Could Recover Attorney's Fees Incurred Preparing For and Attending the Hearing on Appellee's Attorney's Fees

■ In issue seven, appellant contends section 408.221 of the Texas Labor Code does not permit appellee to recover the attorney's fees incurred in preparing for and attending the trial court's hearing on appellee's reasonable and necessary attorney's fees. In response, appellee asserts she is entitled to recovery of those fees

14. In its brief, appellant referenced a single page in the clerk's record and a small section of the reporter's record when addressing preservation of this issue. The clerk's record citation was to an exhibit cover sheet. The reporter's record citation was to a portion of the hearing on appellee's motion for new trial following the trial court granting appellant's motion for summary judgment based on deemed admissions. Neither record citation has any connection with appellant's plenary hearing issue.

and appellant's argument is based on a improper rewording of the statute. We agree with appellee.

### A. The Standard of Review

Because this issue addresses the availability of attorney's fees under a particular statute, the standard of review is the same as that stated in section V of this opinion.

### B. Under Section 408.221 Appellee is Entitled to Recover Those Attorney's Fees Incurred as a Result of Appellant's Appeal

■ Section 408.221(c) provides: "an insurance carrier that seeks judicial review ... of a final decision of the appeals panel regarding compensability or eligibility for, or the amount of, ... death benefits is liable for reasonable and necessary attorney fees ... incurred by the claimant as a result of the insurance carrier's appeal if the claimant prevails on an issue on which judicial review is sought." Tex. Lab.Code Ann. § 408.221(c). Therefore, if the claimant successfully performs the predicate—prevailing on an issue on which the carrier sought judicial review—the claimant is entitled to attorney's fees incurred as a result of the appeal. Here, appellee, through her attorneys, was required to prepare and submit written evidence to the trial court supporting her request for attorney's fees. *See Id.* § 408.221(b). In addition, because the parties could not agree on the amount of appellee's reasonable and necessary attorney's fees, her attorney was required to set and attend a trial court hearing on that matter. We hold appellee incurred these attorney's fees as a result of appellant's appeal. *See Tex. Mun. League Intergovernmental Risk Pool v. Burns,* 209 S.W.3d 806, 819–20 (Tex.App.–Fort Worth 2006, no pet.) (affirming award of post-trial attorney's fees incurred by claimant as a result of worker's compensation insurance carrier's appeal).

In her brief, appellee candidly brought the Dallas court of appeals opinion in *Twin City Fire Ins. Co. v. Vega–Garcia,* 223 S.W.3d 762 (Tex.App.–Dallas 2007, pet. denied) to our attention. In *Vega–Garcia,* the Dallas court of appeals determined section 408.221(c) does not permit the recovery of attorney's fees incurred in pursuit of attorney's fees. *Id.* at 769–70. Because the insurance carrier non-suited its judicial review proceeding, we find *Vega–Garcia* distinguishable from this case and, therefore, it does not change our determination that appellee is entitled to recover those fees incurred as a result of the hearing on attorney's fees. *Id.* at 765. We overrule appellant's seventh issue.

### CONCLUSION

Having overruled all of appellant's issues on appeal, we affirm the trial court's final judgment.