Affirmed and Opinion filed May 28, 2009








 

Affirmed
and Opinion filed May 28, 2009.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-08-00182-CV

____________

 

LAKEISHA THOMAS, Appellant

 

v.

 

UGOCHI UZOKA,
Appellee

 

 



 

On Appeal from the
125th District Court

Harris County,
Texas

Trial Court Cause
No. 2006-22678

 



 

O P I N I
O N








This
appeal arises from a jury verdict in favor of appellee, Ugochi Uzoka (AUgochi@), whose husband Onyebu Christopher
Ozuka (AChris@) died in a head-on automobile
collision.  The driver of the other vehicle involved in the accident, appellant
Lakeisha Thomas (AThomas@), pleaded guilty to criminal charges arising from the
accident but now brings four issues to challenge the jury=s verdict in this corresponding civil
action.  First, she contends the trial court should have instructed the jury
that Chris=s non-use of a seat belt amounted to negligence per se.  Second,
she claims that the expert opinions of the two investigating police officers
are scientifically unreliable and should have been excluded.  Third, she
challenges the factual and legal sufficiency of the evidence supporting the
jury=s findings that she was negligent and
that her conduct was ninety-eight percent responsible for Chris=s death.  Fourth, she argues that the
damages awarded by the jury are excessive.  We find no merit in these issues. 
Therefore, we affirm the judgment.

BACKGROUND

The
automobile accident occurred on May 14, 2004.  That afternoon, Chris, a
taxi-cab driver with Yellow Cab, was proceeding south on Elysian, a four-lane
road that uses an eight-inch-high concrete median to divide the two northbound
and two southbound lanes.  Thomas was driving in the opposite direction,
northbound, in a Nissan pickup truck.  Allegedly, Thomas=s truck came over the concrete median
into oncoming traffic, causing a head-on collision with Chris=s taxi.  Chris, who was not wearing a
seat belt, died at the scene from a blunt-force impact to the chest.  Thomas
was taken to the hospital.

The
accident was investigated by the Houston Police Department, and Thomas was
charged with, and pleaded guilty to, criminally negligent homicide.  She also
stipulated to the truth of the State=s allegations that she Aunlawfully . . . cause[d] the death
of Onyebu [Chris] Uzoka . . . by criminal negligence, namely by failing to
control speed, failing to maintain a single lane of traffic and exceeding the
posted speed limit.@[1]








Chris=s surviving widow, Ugochi Uzoka, sued
Thomas for wrongful death.  She alleged that Thomas caused the collision by
negligently swerving into oncoming traffic.  She further accused Thomas of
speeding.  Thomas denied both allegations, instead claiming that Chris=s taxi had crossed the median.  She
also asserted that, by failing to wear his seat belt, Chris was negligent.

The case
proceeded to a jury trial in October 2007.  Ugochi produced the expert
testimony of two officers with the Houston Police Department, both of whom
supported Ugochi=s version of the facts.  Officer Douglas Ertons (AErtons@), who conducted the accident
investigation, opined that Thomas=s vehicle caused the impact by
swerving in front of Chris=s taxi.  Officer Rolando Saenz (ASaenz@), an expert in the field of accident
reconstruction, then testified that, according to his calculations, Thomas was
driving sixty-eight miles per hour at the time of the collision.  The posted
speed limit was forty-five miles per hour.  Under cross-examination, Thomas
admitted that, arising out of this event, she pleaded guilty to a charge of
criminally negligent homicide and that she stipulated to the State=s specific allegations that she was
speeding and that she failed to maintain a single lane of traffic.

Over
Ugochi=s objection, the trial court
submitted Chris=s comparative negligence to the jury and permitted Thomas to
argue that the failure to wear a seat belt amounted to negligence.  However,
the court rejected a proposed instruction, requested by Thomas, indicating that
the non-use of a seat belt constitutes negligence per se.

In its
verdict, the jury found both drivers= negligence proximately caused Chris=s death.  The jury apportioned
proportionate responsibility at ninety-eight percent for Thomas and two percent
for Chris.  To compensate Ugochi for past and future pecuniary loss, mental
anguish, and loss of companionship and society, the jury awarded $810,000 in
damages.  Thomas has timely appealed the judgment.

                                                        NEGLIGENCE
PER SE








Appellant=s second issue, which we address
first, deals with Chris=s failure to wear a seat belt, in violation of section
545.413 of the Texas Transportation Code.  See Tex. Transp. Code
Ann. ' 545.413(a) (Vernon Supp. 2008). 
Thomas contends that Chris=s non-use of a safety belt amounted to negligence per se
because (1) Chris was in the class of persons that section 545.413(a) is
designed to protect, and (2) his injury was of a type that the statute was
intended to prevent.  See Perry v. S.N., 973 S.W.2d 301, 305 (Tex.
1998).  Therefore, Thomas asked the trial court to submit the following jury
instruction:  AThe law requires an adult to wear a safety belt while in the front seat
of a vehicle during its operation.  A failure to comply with this law is
negligence in itself.@  

The
trial court refused the requested instruction but submitted Chris=s comparative negligence under a
broad-form question asking whether the negligence of either party proximately
caused Chris=s death.  Although the jury found Chris negligent, Thomas still appeals
the omission of the requested negligence per se instruction.  However,
appellant has not shown that the omission probably caused the rendition of an
improper judgment.  Therefore, we will overrule her second issue.

A.        Standard of Review








A trial
court must submit to the jury any instructions that are proper and necessary to
enable the jury to render a verdict.  Tex. R. Civ. P. 277.  An instruction is
proper if it might assist the jury in answering the submitted questions,
correctly states the law,[2] and enjoys
support in the pleadings and evidence.  Rigdon Marine Corp. v. Roberts,
270 S.W.3d 220, 228 (Tex. App.CTexarkana 2008, pet. denied).  However, the jury should not
be burdened with surplus instructions, even those that accurately state the
law.  Arocha v. State Farm Mut. Auto. Ins. Co., 203 S.W.3d 443, 445
(Tex. App.CHouston [14th Dist.] 2006, no pet.).  

A trial
court has considerable discretion to submit necessary and proper jury
instructions.  See id.; Wal-Mart Stores, Inc. v. Middleton, 982
S.W.2d 468, 470 (Tex. App.CSan Antonio 1998, pet. denied).  Therefore, we review a trial
court=s decision to refuse a particular
instruction under an abuse of discretion standard.  Shupe v. Lingafelter,
192 S.W.3d 577, 579 (Tex. 2006).  When a trial court refuses to submit a
requested instruction on an issue raised by the pleadings and evidence, we are
to determine whether the instruction was reasonably necessary to enable the
jury to render a proper verdict.  Id.  If so, the refusal to submit a requested
instruction will constitute reversible error only if the omission probably
caused the rendition of an improper judgment.  Id. 

B.        Harm Analysis








We open
our discussion with a brief overview of negligence per se and, when 
submitted, its effect on the jury charge.  Generally, negligence per se
is a common-law tort concept in which a person=s expected standard of conduct is
defined by a statute instead of the reasonably-prudent-person test usually
found in Apure@ common-law negligence claims.  See Smith v. Merritt, 940 S.W.2d
602, 607 (Tex. 1997).  When negligence per se is submitted, the jury is
not asked to decide whether the person acted as a reasonably prudent person
would have acted under the same or similar circumstances, because the statute
itself identifies the appropriate standard of conduct as a matter of law.  Durham
v. Zarcades, 270 S.W.3d 708, 718 (Tex. App.CFort Worth 2008, no pet.); Goode
v. Bauer, 109 S.W.3d 788, 791 (Tex. App.CCorpus Christi 2003, pet. denied) (AThe effect of declaring conduct as
negligence per se is that the conduct constitutes negligence as a matter of
law.@).  Instead, unless an excuse for the
statutory violation is proffered, the jury need decide only (1) whether the
statute was violated and, if so, (2) whether the statutory violation was a
proximate cause of the injury.  Carter v. William Sommerville & Son,
Inc., 584 S.W.2d 274, 278 (Tex. 1979); Durham, 270 S.W.3d at 719.








Negligence
per se is not a separate cause of action that exists independently of a
common-law negligence cause of action.  Zavala v. Trujillo, 883 S.W.2d
242, 246 (Tex. App.CEl Paso 1994, writ denied).  Rather, negligence per se
is merely one method of proving a breach of duty, a requisite element of
any negligence cause of action.  Reynolds v. Murphy, 188 S.W.3d 252, 267
n.20 (Tex. App.CFort Worth 2006, pet. denied) (quoting Zavala, 883
S.W.2d at 246).  Here, while that specific option was not available to Thomas, 
the trial court granted her request to submit Chris=s non-use of a seat belt through a
broad-form negligence question and, in fact, the jury found Chris negligent. 
Thus, because the requested instruction would not have produced a different
outcome, we cannot conclude that Thomas was harmed by the omission of the
requested instruction.[3]  See Mieth
v. Ranchquest, Inc., 177 S.W.3d 296, 305 (Tex. App.CHouston [1st Dist.] 2005, no pet.) (A[T]he trial court abused its
discretion by refusing to submit an instruction on negligence per se.  However,
because the jury found [the defendant] negligent under the common-law
definition, the trial court=s error was harmless.@).[4]

Thomas
responds that she was harmed by the omission because, had the jury known that
the non-use of a safety belt is prohibited by statute, it might have assigned a
higher percentage of responsibility to Chris, thereby reducing the amount of
Thomas=s liability for the damages awarded. 
See Tex. Civ. Prac. & Rem. Code Ann. ' 33.012(a) (Vernon 2008). However, as
this Court noted in Patterson v. Landua, a negligence per se
instruction does not affect the jury=s apportionment of responsibility
among various causes of a plaintiff=s injuries.  No. 14-97-00372-CV, 1998
WL 322693, at *4 (Tex. App.CHouston [14th Dist.] June 18, 1998, pet. denied) (not
designated for publication).  Negligence per se may substitute for proof
that a legal duty was breached; however, it does not compel the jury to
conclude that the statutory violation was a proximate cause of the damages
claimed.  See Carter, 584 S.W.2d at 278 (indicating that, even when
negligence per se is submitted, a jury must still decide whether
statutory violation was a proximate cause of the claimed damages); Durham,
270 S.W.3d at 719.  








Because
apportionment of responsibility is a subsidiary question that goes to causation,
it is similarly unaffected by a negligence per se instruction.  See Tex.
Civ. Prac. & Rem. Code Ann. ' 33.003(a) (Vernon 2008) (AThe trier of fact . . . shall
determine the percentage of responsibility . . . with respect to each person=s causing or contributing to cause
. . . the harm for which recovery of damages is sought[.]@) (emphasis added); id. ' 33.011(4) (defining Apercentage of responsibility@ as percentage attributed to each
party Awith respect to causing or
contributing to cause@ claimed damages).  Therefore, it cannot be said that
inclusion of a negligence per se instruction would have altered the jury=s decision to assign to Thomas
ninety-eight percent of the responsibility for causing Chris=s death.  See Shupe, 192 S.W.3d
at 580.  Accordingly, Thomas has not shown that the absence of the requested
instruction probably caused the rendition of an improper verdict.  See
Tex. R. App. P. 44.1(a)(1).

Thomas
reminds us that she presented two factual bases for the jury to find Chris
negligent: failing to wear a seat belt and driving while distracted.  She
contends we cannot determine on which ground the jury found Chris negligent and
suggests that, in the absence of a negligence per se instruction, the
jury might have rejected her seat-belt theory and instead faulted Chris under
her distracted-driver allegation.[5]  She
therefore argues that the omission of the requested instruction prevented her
from properly presenting this appeal, see Tex. R. App. P. 44.1(a)(2),
and asks us to presume harm under Crown Life Insurance Co. v. Casteel. 
22 S.W.3d 378 (Tex. 2000).  We decline to extend Casteel under these
circumstances.

In Casteel,
the Texas Supreme Court held that, when a jury bases a finding of liability on
one broad-form question that commingles invalid theories of liability with
valid theories, an appellate court often cannot determine the effect of the
error and therefore should presume harm.  See id. at 388.  It reasoned
that, when a broad-form submission contains both valid and invalid legal
theories, the jury may have found the defendant liable solely on a legal theory
that should not have been submitted.  See id. at 389.  Thus, the
defendant may have suffered harm from the improper submission but cannot prove
it.  See id. at 388.  








However,
in this case Thomas has not shown even a possibility of harm inasmuch as
she received the jury finding she desired, that is, that Chris was negligent,
and the requested instruction does not affect the jury=s apportionment of responsibility
among the parties.   See Shupe, 192 S.W.3d at 580. Moreover, the Texas
Supreme Court has expressly declined to extend Casteel to cases like
this one.  See Bed, Bath & Beyond, Inc. v. Urista, 211 S.W.3d 753,
757 (Tex. 2006).

Therefore,
Thomas has not shown that the alleged error probably prevented her from
presenting her appeal.  See Tex. R. App. P. 44.1(a)(2).  Accordingly, we
overrule appellant=s second issue.

            SUFFICIENCY
AND RELIABILITY OF EVIDENCE OF NEGLIGENCE

Appellant=s third and fourth issues are
related, and we address them together.  In her fourth issue, Thomas contends
the evidence is legally and factually insufficient to support the jury=s findings with respect to
negligence, proximate cause, and proportionate responsibility.  This
sufficiency claim is premised upon her argumentCcontained in both her third and
fourth issuesCthat the opinions offered by Ertons and Saenz, while supportive of the
verdict, constitute Ano evidence@ because such testimony was unreliable and inadmissible. 
Thus, before we address Thomas=s sufficiency complaint, we must review her challenge to the
reliability of both officers= expert testimony.  See Transcon. Ins. Co. v. Crump,
274 S.W.3d 86, 96 (Tex. App.CHouston [14th Dist.] 2008, pet. filed). 

A.        Reliability of Officers= Opinions








Generally,
courts review a challenge to the admission of expert testimony under an abuse
of discretion standard.  See Taylor v. Am. Fabritech, Inc., 132 S.W.3d
613, 618 (Tex. App.CHouston [14th Dist.] 2004, pet. denied).  However, when a
trial court admits expert testimony that is challenged on appeal as
constituting Ano evidence,@ as here, we review the reliability of the expert testimony
using a de novo standard of review.  Transcon. Ins. Co., 274
S.W.3d at 96; Goodyear Tire & Rubber Co. v. Rios, 143 S.W.3d 107,
113 (Tex. App.CSan Antonio 2004, pet. denied).  

The
trial court is charged with ensuring that expert testimony is based upon a
reliable foundation and is relevant to the issues in the case.  Gammill v.
Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 728 (Tex. 1998).  In
deciding the reliability of an expert=s methodology and the underlying
data, the trial court may consider several non-exclusive factors, including (1)
the extent to which the expert=s theory has been or could be tested; (2) the extent to which
his technique relies upon subjective interpretation; (3) whether his technique
has been subjected to peer review and/or publication; (4) the potential error
rate for the technique; (5) whether the expert=s underlying theories or techniques
have been generally accepted as valid by the relevant scientific community; and
(6) the non-judicial uses that have been made of the theory or technique.  See
E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 557 (Tex.
1995).  In addition, a trial court may give weight to the expert=s skill and experience when
appropriate to do so.  See Gammill, 972 S.W.2d at 726.  If there is an
analytical gap between the expert=s conclusions and the underlying data
upon which he relies, his expert testimony may be unreliable and inadmissible. 
See id.

The
expert testimony Thomas seeks to exclude came from Ertons and Saenz, and fall
into two rough categories.  First, both officers testified, on the strength of
physical evidence collected at the accident scene, that the collision occurred
because Thomas=s vehicle cut across the concrete median into oncoming traffic.  Second,
Saenz determined, using foundational data and measurements gathered by Ertons,
that Thomas was speeding at the time of the collision.  Hoping to exclude these
opinions, Thomas argues that Saenz=s opinions were drawn from unreliable
foundational data provided by Ertons.

 

 








1.         Crossing the Median

Generally,
Thomas insists that Ertons failed to exclude alternative causes for the
collision, and that an analytical gap therefore renders his opinions
unreliable.  See Robinson, 923 S.W.2d at 558B59.  Specifically, during the course
of his investigation, Ertons interviewed Thomas, who denied that her truck
transversed the concrete median.  Instead, she claimed that she was driving in
her own lane and saw Chris=s vehicle driving in her lane, but she could not avoid
a collision.  After examining the accident scene, Ertons rejected Thomas=s story and concluded that she, not
Chris, crossed the median and caused the accident.

Thomas
argues that, before Ertons could offer testimony as an expert, he was obligated
to consider and rule out other possible causes for the collision.[6] 
See id. at 559 (holding that expert=s failure to rule out other causes of
damage rendered his opinion little more than speculation); Emmett Props.,
Inc. v. Halliburton Energy Servs., Inc., 167 S.W.3d 365, 373B74 (Tex. App.CHouston [14th Dist.] 2005, pet.
denied).  While we agree with that general proposition, the record indicates
that Ertons did not overlook Thomas=s version of the facts.  Instead, he
decided that her claim was inconsistent with, and contradicted by, the physical
evidence he found at the accident scene.








For
example, Ertons found fresh gouge marks in the median south of the impact sceneCthe direction from which Thomas was
travelingCbut not north.[7]  This finding
supported his opinion that, as Thomas=s northbound vehicle crossed the
median, the underside of her truck scratched the concrete median, leaving
behind gouge marks and powdery concrete residue. 

Next,
Thomas complains that Ertons failed to interview any witnesses to the
collision.  Of course, this contention presupposes that somebody in fact
witnessed the accident.  However, nobody who claimed to have seen the impact
came forward; in addition, Ertons suggested that the presence of witnesses
would have been unlikely because the collision occurred in a rather remote,
unpopulated location that he described as Athe middle of nowhere.@ 

Therefore,
on the record presented, we hold that the trial court properly admitted Ertons=s expert testimony as to the cause of
the automobile collision.  Next, we address Thomas=s objection to Saenz=s opinions about the vehicle speeds
at the time of impact.

2.         Vehicle Speeds








Thomas
presents two basic objections to the reliability of Saenz=s expert testimony.  First, she
contends that his opinions depend upon unreliable measurements provided by
Ertons.  Second, she argues that Saenz used flawed methodology to draw expert
conclusions from those measurements.  As such, she concludes the trial court
should have excluded Saenz=s opinions about the respective speeds of both vehicles at
impact.  See Ford Motor Co. v. Ledesma, 242 S.W.3d 32, 39 (Tex. 2007).  

a.         Reliability of Underlying
Data

We begin
with a look at Ertons= measurements, which were transcribed from his notes into a
scale diagram that Saenz used in calculating vehicular speeds.  Thomas presents
three objections to the reliability of these measurements.  First, she claims
that the device Ertons employed to take those measurementsCa roller wheelCis less accurate than a Atotal station device.@  However, at the time of the
accident, the Houston Police Department did not own a total station device, an
instrument that Ertons described as only Avery modestly more accurate@ than a roller wheel.  Moreover,
Ertons testified that a roller wheel produces reliable measurements, and
further confirmed that the use of a roller wheel is generally accepted as a
valid instrument used in taking measurements in the field of accident
investigation.  See Robinson,  923 S.W.2d at 557.

Second,
Thomas contends that, because Ertons disposed of his original field notes, the
measurements listed in the scale diagram cannot be trusted because the
possibility exists that Ertons might have incorrectly transcribed the figures
from his notes.  In response, Ertons confirmed that he correctly copied all of
the information from his field notes into the offense report, accident report,
and scale diagram.  In addition, had there been some question about the
accuracy of his measurements, Ertons testified that the original figures could
be recreated from the accident photographs through a process called Aphotogrammetry.@  Stated differently, the accuracy of
the measurements could be tested and independently verified.  Therefore, the
loss of Ertons=s field notes does not render those measurements unreliable.  See id.








Third,
Thomas challenges the use of the scale diagram altogether in rendering
calculations about vehicle speed, because the initial pre-collision location of
Chris=s taxi on the diagram is entirely
unsupported by any facts or measurements.  She therefore insists that Saenz
could not reliably use the figures listed in the diagram to calculate vehicle
speeds.  However, the record indicates that, in computing vehicle speeds, Saenz
ignored Ertons=s depiction of the pre-impact location of Chris=s vehicle.  This fact is borne out in
the officers= testimony and the scale diagram itself.[8] 
Thus, we cannot conclude that the trial court erred by permitting Saenz to draw
conclusions from the measurements listed in the scale diagram.

b.         Reliability of Opinions
Drawn from Data








Saenz
reached his opinions about vehicle speed by using a computer program called
WinCrash.  Thomas challenges those opinions on three basis grounds: (1) Saenz
was forced to guess at the total pre-collision weight of each vehicle; (2) the
speed calculations were generated using an incorrect impact-angle analysis; and
(3) the WinCrash report contained several errors that undermine any confidence
in the program=s computations.  As we address these concerns, we remain mindful that
courts are not to decide whether an expert=s conclusions are correct, but
instead whether the analysis he used to reach them is reliable.  See Gammill,
972 S.W.2d at 728.  That guidance is particularly important here because the
record is not well-developed enough to resolve some of appellant=s challenges to the WinCrash report.[9] 
See, e.g., Harris County Hosp. Dist. v. Textac Partners I, 257 S.W.3d
303, 310 (Tex. App.CHouston [14th Dist.] 2008, no pet.) (expressing reluctance to
find error, and sustain appellate point, in light of underdeveloped appellate
record).  Generally, however, Saenz confirmed that his vehicle-speed
calculations rely upon well-known physics and mathematics principles, that the
formulas he used are recognized and verifiable by other experts, and that the
software and methodology he employed is reliable, peer-reviewed, and generally
accepted by the accident-reconstruction community.  See Robinson, 923
S.W.2d at 557.

Thomas=s first complaint deals with the
estimated pre-collision weights for each vehicle.  Apparently, WinCrash
requires the user to input the total weight of each vehicle before the impact. 
Unfortunately, those exact figures are almost always unavailable after a
collision has occurred.  Therefore, accident reconstruction experts must
instead consider estimated vehicle weights.  Here, for example, the average
weight of Thomas=s Nissan pickup truck is listed at 2,750 pounds; Chris=s Ford Crown Victoria, by contrast,
is said to weigh 3,920 pounds.  Those base figures do not reflect the weight of
vehicles laden with occupants, contents, or vehicle fluids such as gasoline. 
Therefore, Thomas acknowledges that Areconstructionists often have to
guess the weights of vehicle[s] to compensate for debris and fluids that were
lost during the crash[.]@ However, the crux of her argument appears to arise from the
fact that the accident-reconstruction community has not established definitive
guidelines to be used in determining how many pounds should be added to a
vehicle=s base weight to arrive at an
estimated pre-collision weight.








Here, as
in the usual case, Saenz could not have obtained an exact pre-collision weight
for either vehicle because (1) both drivers were removed from the scene, one to
the hospital and the other to the morgue; (2) debris was strewn all about the
road; and (3) vehicle fluids had been splattered on the ground.  Therefore, as
an estimate of pre-collision vehicle weights, Saenz added 200 pounds to the
Nissan=s base weight to compensate for
Thomas=s weight and that of the contents and
fluids.  However, because a taxi typically carries extra equipment not ordinarily
found in a passenger automobile, Saenz added more weightC300 poundsCto the Crown Victoria=s base weight.  Thomas does not
specifically challenge these estimated figures, except to complain about the
lack of an industry standard.  We are left with no basis to question Saenz=s validity given that both parties
agree that the practice of using estimated pre-collision vehicle weights
is generally accepted within the accident-reconstruction community.  See id.

Apparently,
another factor that WinCrash considers in calculating vehicle speeds is the
angle at which the cars collide.  Depending on the angle, WinCrash uses one of
two different formulas to render its computations: a linear-momentum formula
and an angular-momentum formula.  When vehicles collide at an angle of greater
than ten degrees, the angular-momentum formula should be used in lieu of the linear-momentum
formula.  Here, Saenz assumed that the vehicles collided at an impact of
twenty-one degrees.  This determination would apparently dictate that WinCrash
use the angular-momentum formula.  Instead, Thomas contends that WinCrash
incorrectly used the linear-momentum formula. 








As we
attempt to resolve this objection, we note that the record on this point is
rather unclear.  Even if we assume that WinCrash employed the incorrect formula
in calculating vehicle speeds, the record is silent as to the effect of that
error on the reliability of the program=s conclusions.  An entry in the HPD
records implies that, if anything, WinCrash may have underestimated the
speed of Thomas=s vehicle at the point of impact.  In any event, although
WinCrash apparently reported a value using the linear-momentum value, Saenz=s testimony suggests that the program
also incorporated the correct angular-momentum formula.[10] 
Thus, we cannot conclude from this underdeveloped record that the trial court
was required to exclude Saenz=s expert testimony that Thomas was driving at least
sixty-eight miles per hour.

Finally,
Thomas contends that the WinCrash computations are unreliable because the
program reported several error messages that should have undermined the trial
court=s confidence in the validity of its
calculations.  However, Saenz explained that each of the error messages was
expected and could be explained by the physical evidence found at the accident
scene.  For example, WinCrash assumes that vehicles collide on a flat, level
surface and that, after impact, there are no obstacles that might impede the
vehicles= movement to their final resting
spot.  However, in this case, each vehicle met an obstacle that slowed or
stopped its lateral movement after the accident.  Because Thomas=s truck was straddling the median, it
did not fully rotate as would be expected on a flat surface because the median
itself slowed that rotation.  Similarly, the lateral movement of Chris=s taxi was stopped by the presence of
the guardrail on the side of the road.  However, because WinCrash did not know
about the existence of the median or guardrail, it predicted more rotation by
Thomas=s truck and greater lateral movement
by Chris=s taxi than actually occurred. 
Therefore, the program generated several error messages indicating that, if the
collision occurred as indicated, the vehicles did not behave post-impact as the
computer model predicted they would.  








In
response, Saenz testified that it is generally accepted in the
accident-reconstruction community to rely upon WinCrash results when the
program=s error messages can be explained by
the physical evidence.  See Robinson, 923 S.W.2d at 557.  Moreover, he
indicated that, while the error messages might result in an understatement of
the vehicles= lateral momentum speed, they would not affect the equivalent barrier
speed, which was the calculation that Saenz quoted to the jury.  Stated
differently, the error messages had nothing to do with Saenz=s equivalent-barrier-speed opinions.

Therefore,
we conclude that the trial court properly admitted the expert testimony of both
investigating officers, because their opinions were based on a reliable
foundation.  Accordingly, we overrule appellant=s third issue.

B.        Legal and Factual
Sufficiency of Evidence of Negligence, Proximate Cause, and Proportionate
Responsibility

In her
fourth issue, Thomas challenges the legal and factual sufficiency of the
evidence supporting the jury=s findings that she was negligent and that her conduct was
ninety-eight percent to blame for Chris=s death.  In a legal sufficiency
review, we view the evidence in the light most favorable to the verdict and
must indulge every reasonable inference that supports the verdict.  City of
Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005).  We must credit evidence
in support of the judgment if reasonable jurors could and must disregard
contrary evidence unless reasonable jurors could not.  See id. at 827. 
If the evidence falls within the zone of reasonable disagreement, we will not
substitute our judgment for the fact finder=s.  Id. at 822.  We must
affirm unless there is no favorable evidence, the favorable evidence is
rendered incompetent, or the contrary evidence conclusively establishes the
opposite proposition.  See id. at 810B11.  Simply stated, we will consider
whether the evidence at trial would have enabled reasonable and fair-minded
people to reach the verdict that is under review.  Id. at 827.








By
contrast, in a factual sufficiency review, we are to consider and weigh all of
the evidence both supporting and contradicting the finding in question.  Plas-Tex,
Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989).  We may set
aside the finding only if it is so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust.  Dow Chem. Co. v. Francis,
46 S.W.3d 237, 242 (Tex. 2001).  We may not pass upon the witnesses= credibility or substitute our
judgment for the jury=s even if the evidence could support a different result.  Transcon.
Ins. Co., 274 S.W.3d at 98.  The amount of evidence that is necessary to
affirm a judgment is far less than the amount necessary to reverse it.  Id.;
GTE Mobilnet of S. Tex. Ltd. P=ship v. Pascouet, 61 S.W.3d 599, 616 (Tex. App.CHouston [14th Dist.] 2001, pet.
denied).  Thus, when we reverse a judgment for factual insufficiency, we must
detail the evidence relevant to the issue and state in what manner the contrary
evidence greatly outweighs the evidence in support of the judgment, but we need
not do so when affirming a jury=s verdict.  Mar. Overseas Corp. v. Ellis, 971 S.W.2d
402, 407 (Tex. 1998); Transcon. Ins. Co., 274 S.W.3d at 98 (citing Gonzalez
v. McAllen Med. Ctr., Inc., 195 S.W.3d 680, 681 (Tex. 2006)).

Having
determined that the expert opinions offered by Ertons and Saenz were based on a
reliable foundation, we must consider those opinions in our sufficiency
review.  See Transcon. Ins. Co., 274 S.W.3d at 99.  Here, all of the
following evidence supports the conclusion that Thomas, and not Chris, crossed
the median and caused the accident that resulted in Chris=s death:

$          There were fresh gouge marks on the median, including powdery
concrete residue, south of the impact sceneCthat
is, the direction from which Thomas=s
truck cameCbut not north.








$          All of the debris from the impact was on Chris=s side of the road, indicating that the collision
occurred on his side of the median.  By contrast, there was no impact debris on
Thomas=s side of the median that would have indicated a
collision in the northbound lanes; instead, the only debris that appeared on
Thomas=s side of the road was from materials that were flung
out of the back of her pickup truck as it rotated after the collision.

$          All of the vehicle fluids were spilled on Chris=s side of the median, and there were no fluids
splattered in the northbound lanes.

$          Thomas=s truck remained on top of the median even after the
collision.

$          Thomas was charged with, and pleaded guilty to, criminally
negligent homicide arising from this accident.  She also stipulated to the
truth of the State=s allegations that she Aunlawfully . . . cause[d] the death of Onyebu [Chris] Uzoka . . . by
criminal negligence, namely by failing to control speed, failing to maintain a
single lane of traffic and exceeding the posted speed limit.@[11]

 

This evidence supports
the jury=s findings that Thomas was negligent
and that ninety-eight percent of the responsibility for causing Chris=s death was attributable to her
conduct.  Therefore, we hold the evidence was legally sufficient to support the
jury=s verdict.  

For the
same reasons, we conclude that the jury=s findings are not against the great
weight and preponderance of the evidence.  Although Thomas denied that she
crossed the median, exceeded the speed limit, or caused the accident, the jury
was not required to accept that testimony, particularly given the fact that she
judicially admitted to having done all three.  Moreover, as is discussed above,
the evidence does not necessarily compel the conclusion that Chris caused the
collision or that he was driving while reading a newspaper.  Therefore, we hold
that the evidence is factually sufficient to support the jury=s verdict.

Accordingly,
we overrule appellant=s fourth issue.

 








                                       EXCESSIVENESS
OF DAMAGE AWARDS

Lastly,
we address appellant=s first issue, in which she complains of the excessiveness of
the jury=s award of $810,000 to Ugochi for
past and future pecuniary loss, loss of companionship and society, and mental
anguish.  We review an excessive-damages complaint for factual sufficiency of
the evidence, using the guidelines identified above.  See Mar. Overseas Corp,
971 S.W.2d at 406.  

We are
reminded that the nebulous issues of pecuniary loss, mental anguish, and loss
of society are inherently somewhat imprecise.  See Samco Props., Inc. v.
Cheatham, 977 S.W.2d 469, 480 (Tex. App.CHouston [14th Dist.] 1998, pet.
denied); Tri-State Motor Transit Co. v. Nicar, 765 S.W.2d 486, 495 (Tex.
App.CHouston [14th Dist.] 1989, no writ). 
Thus, because such damages are unliquidated and incapable of precise
mathematical calculation, the jury is given significant discretion in fixing
the amount of the award.  Weidner v. Sanchez, 14 S.W.3d 353, 372 (Tex.
App.CHouston [14th Dist.] 2000,  no pet.);
J. Wigglesworth Co. v. Peeples, 985 S.W.2d 659, 665B66 (Tex. App.CFort Worth 1999, pet. denied); see
also Pittsburgh Corning Corp. v. Walters, 1 S.W.3d 759, 781 (Tex. App.CCorpus Christi 1999, pet. denied) (A[D]eterminations of pain and
suffering damages cannot be neatly confined to mathematical certainties.@).  However, that discretion is
limited in that it must enjoy evidentiary support; in other words, A[j]uries cannot simply pick a number
and put it in the blank.@  Saenz v. Fid. & Guar. Ins. Underwriters, 925
S.W.2d 607, 614 (Tex. 1996).  With these considerations in mind, we turn to the
evidence that bears upon the challenged elements of damages.

A.        Pecuniary Loss








In
certain wrongful death actions, a beneficiary may recover damages for Apecuniary loss,@ that is, the present value of the
benefits, including money and other benefits that could be valued in terms of
money, that the beneficiary could reasonably expect to have received from the
deceased had he survived.  Samco Props., 977 S.W.2d at 480.  These lost
financial benefits may be recovered even in the absence of specific evidence of
the amount of contributions being made by the deceased before his death or that
he would have continued to contribute in the future.  John Deere Co. v. May,
773 S.W.2d 369, 381 (Tex. App.CWaco 1989, writ denied).

In
arriving at its verdict awarding $10,000 in past damages and $100,000 for
future pecuniary loss, the jury heard the following evidence as to the
financial benefits Chris provided to Ugochi before his passing:

$          Chris purchased an automobile for Ugochi, at a cost of
between $4,000 and $4,500.

$          Chris paid for some of Ugochi=s meals and clothes.

$          From time to time, Chris would send cash in $100 and $200
increments to Ugochi.

$          Chris assisted with the payment of Ugochi=s tuition at Texas A&M University, paying at least
$1,000.[12]

 








Thus, the jury was
presented with evidence indicating that, in the several years of their
marriage, Chris provided financial contributions to Ugochi of more than
$5,000.  Further, Ugochi testified that, upon graduation from Texas A&M
University, she planned to return to Houston to live with Chris in a new
apartment, where the couple intended to raise a family.[13] 
Thus, the jury was entitled to believe that, but for Chris=s death, he would have continued to
provide financial benefits to Ugochi.  Therefore, we cannot conclude that the
jury=s finding of $10,000 in past
pecuniary loss, representing the three-year time period between Chris=s death and the trial, was so
contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust.  See Francis, 46 S.W.3d at 242.  

Similarly,
the evidence indicates that, before his death, Chris was thirty-nine years old
and in reasonably good health.  The record contains no evidence suggesting
that, but for his death, the couple could not have enjoyed several more decades
of marriage during which Chris would continue to contribute financial benefits
to Ugochi.  Therefore, we hold that the evidence is factually sufficient to
support the jury=s award for pecuniary losses of $10,000 for past damages and
$100,000 in the future.

B.        Mental Anguish and Loss of
Companionship and Society

The jury
also awarded the following damages for mental anguish and loss of companionship
and society:

1.         Mental anguish sustained in the past: $100,000;

2.         Mental anguish that, in reasonable probability, would be
sustained in the future: $50,000;

3.         Loss of companionship and society sustained in the past:
$100,000; and

4.         Loss of companionship and society that, in reasonable
probability, would be sustained in the future: $450,000.

 

Appellant contends that
all of these damage awards are excessive.








At this
juncture, we pause briefly to consider the distinctions between mental anguish
and loss of companionship and society.  While both compensate for non-economic
losses, the two elements of damages are separate and do not overlap.  See
Moore v. Lillebo, 722 S.W.2d 683, 688 (Tex. 1986).  AMental anguish@ is defined as the emotional pain,
torment, and suffering that the wrongful-death beneficiary experienced as a
result of the death of her family member.  Id.  Damages for mental
anguish are intended to compensate the beneficiary for the deleterious effect
that the wrongful death had on the beneficiary.  See id.  To recover
mental anguish, a claimant must demonstrate a high degree of mental suffering
beyond disappointment, anger, resentment, or embarrassment, although mental
anguish may include all of these emotions.  See Phar-More, Inc. v. Chavira,
853 S.W.2d 710, 712 (Tex. App.CHouston [1st Dist.] 1993, writ denied).  Thus, proof of
mental anguish can include painful emotions such as grief, severe
disappointment, indignation, wounded pride, shame, despair, public humiliation,
or a combination of any or all of those feelings.  See Wal-Mart Stores, Inc.
v. Odem, 929 S.W.2d 513, 528 (Tex. App.CSan Antonio 1996, writ denied).  

By
contrast, Aloss of companionship and society@ refers to the positive benefits
flowing from the love, comfort, companionship, and society that the beneficiary
would have experienced had the decedent lived.  See Moore, 722 S.W.2d at
687B88.  As compared with mental anguish,
which emphasizes the negative impact of the wrongful death on the
beneficiary, loss of companionship and society focuses on the removal of positive
benefits that the beneficiary once enjoyed but which were taken away by the
wrongful death.  See id. at 688.  Although mental anguish is
distinguishable from loss of companionship and society, in awarding damages for
both elements, the jury may consider some of the same factors.  Those
considerations include (1) the relationship between the husband and wife; (2) the
living arrangements of the parties; (3) any extended absence of the deceased
from the beneficiary; (4) the harmony of family relations; and (5) the couple=s common interests and activities.  See
id.  

In this context, Thomas  suggests
that the couple=s marriage was one that existed Ain name only,@ and argues that Ugochi Asuffered no adverse effects as a
result of her husband=s death.@  In so doing, Thomas emphasizes certain pieces of evidence,
including that (1) the couple lived apart and maintained separate finances, (2)
Ugochi was not listed as Chris=s emergency contact, and (3) Ugochi had not met several of
Chris=s family members.  








However,
much of  that evidence can be explained by the mere fact that, during the first
few years of their marriage, circumstances forced the couple to live in
different cities.  Ugochi was enrolled at Texas A&M.  At the time of her
marriage, Ugochi had already relocated to College Station, where she maintained
a separate apartment and bank account.  Chris, a taxi driver and student at
Texas Southern University, continued to work in Houston but saw and lived with
Ugochi on the weekends.   Further, it would not be unusual for Chris, who lived
in an altogether different city from Ugochi, to have selected a
geographically-closer friend as his emergency contact, in the event that
something unfortunate might occur to him while he was often located more than a
hundred miles away from his wife. 

The jury
was presented with adequate evidence of the mental anguish and loss of
companionship and society that Ugochi suffered because of her husband=s death.    The jury had the benefit
of observing Ugochi as she testified at some length about the relationship she
shared with Chris and the impact of his death on her.  See Seale v. Winn
Exploration Co., 732 S.W.2d 667, 671 (Tex. App.CCorpus Christi 1987, writ denied). 
Among other things, she testified that they had  made plans for the future. 
Ugochi intended to return to Houston after graduation and move into a Agood apartment@ with Chris.  She had plans to follow
through with a formal wedding ceremony inasmuch as they were initially married
in an informal occasion at the courthouse.  They also planned to have at least
two, and possibly as many as four, children together.

Thus,
given the record presented, we cannot conclude that the jury=s award is so against the great
weight and preponderance of the evidence that it is manifestly unjust, shocks
the conscience, or clearly demonstrates the existence of bias.  See Sw. Bell
Tel. Co. v. Garza, 164 S.W.3d 607, 622 (Tex. 2004); Pool v. Ford Motor
Co., 715 S.W.2d 629, 635 (Tex. 1986).  Therefore, we hold that the evidence
is factually sufficient to support the amount of damages awarded by the jury.

Accordingly,
we overrule appellant=s issue.

 








                                                                 CONCLUSION

Finding
no merit in the issues presented on appeal, we affirm the judgment of the trial
court.

 

 

/s/      Kent C. Sullivan

Justice

 

 

 

 

Panel consists of Justices Yates and
Sullivan, and Senior Justice Hudson.*









            [1]  Capitalization
normalized.





            [2]  Because of our
resolution of this issue, we need not decide whether the requested instruction,
which identified the decedent=s conduct as
potential negligence instead of as a failure to mitigate damages,
correctly stated the law.  Here, although Thomas alleged that Chris=s non-use of a seat belt exacerbated his injuries and
ultimately caused his death, she did not contend that such conduct caused the
underlying automobile collision itself.  Chris=s non-use Amerely increase[d] or add[ed] to the extent of the
loss or injury occasioned by another=s
negligence.@  See Young v. Thota, 271 S.W.3d 822, 829 (Tex.
App.CFort Worth 2008, pet. filed) (quoting Elbaor v. Smith,
845 S.W.2d 240, 245 (Tex. 1992)).  Therefore, under a traditional common-law
analysis, his conduct arguably should be submitted by a mitigation-of-damages
instruction instead of a contributory-negligence question.  See Kerby v.
Abilene Christian Coll., 503 S.W.2d 526, 528 (Tex. 1973) (drawing Asharp distinction@
between negligence leading to the accident versus that which merely contributes
to the damages sustained).  

 

However, in 1995 the Legislature specifically enacted
a proportionate responsibility statute that requires the fact-finder to
determine all parties= percentage of responsibility for causing a plaintiff=s claimed injuries.  See Tex. Civ. Prac. &
Rem. Code Ann. '' 33.003(a), 33.011(4) (Vernon 2008).  Consequently, it
may have intended to abolish the common-law distinction between a plaintiff=s Aoccurrence-causing@ and Ainjury-causing@ negligence.  See Comm. on Pattern Jury
Charges, State Bar of Tex., Texas Pattern Jury Charges: General Negligence
& Intentional Personal Torts PJC 4.1 cmt., at 44B45 (2008).  Indeed, the statutory language may now
mandate the submission exclusively in the context of injury-causing conduct.  See
Tex. Civ. Prac. & Rem. Code Ann. '
33.003(a) (AThe trier of fact . . . shall determine the percentage
of responsibility . . . with respect to each person=s causing or contributing to cause in any way the harm
for which recovery of damages is sought[.]@)
(emphasis added).

 

In this case, we conclude Thomas has not
demonstrated that the omission of the negligence per se instruction
probably caused the rendition of an improper judgment.  See Shupe v.
Lingafelter, 192 S.W.3d 577, 579 (Tex. 2006).  Therefore, we do not reach
the issue of how a trial court, in light of Kerby, Elbaor, and
CPRC chapter 33, should properly submit a plaintiff=s non-use of a seat belt that was injury-causing but
not occurrence-causing.





            [3]  Notably, during
closing argument, Ugochi did not challenge her opponent=s claim that Chris had acted negligently by failing to
wear his safety belt.  Instead, she argued to the jury that his non-use of a
seat belt was not a proximate cause of his death.





            [4]  See also
Patterson v. Landua, No. 14-97-00372-CV, 1998 WL 322693, at *4 (Tex. App.CHouston [14th Dist.] June 18, 1998, pet. denied) (not
designated for publication) (AIn the present
case, Patterson obtained the same result as the [negligence per se]
instruction would have garnered because the jury ultimately found Landua
negligent. . . .  Thus, the refusal to submit the instruction had no effect on
the outcome of the trial.@).





            [5]  We note Thomas
did not object to the submission of both factual theories in one broad-form
negligence question.  Of course, Texas long ago rejected the use of special-issue
practice to allow the granulated submission of every potential factual theory
of a legal claim.  See Tex. R. Civ. P. 277.  In fact, the Supreme Court
has suggested that, under broad-form submission rules, jurors need not agree on
the same factual negligence theory as long as they agree to the legally
relevant result.  See Dillard v. Tex. Elec. Coop., 157 S.W.3d 429, 434
(Tex. 2005).





            [6]  In a related
argument, Thomas contends that Ertons improperly ignored evidence favorable to
her claim.  For example, she interprets an in-car photograph, apparently taken
before the collision, as depicting Chris staring at an off-the-screen objectCwhich she speculates could be a newspaperCwhile driving.  In addition, Chris was found holding a
newspaper in his left hand after the accident.  She contends that these two
pieces of evidence should have led Ertons to conclude that Chris was a
distracted driver whose vehicle crossed the median and caused the accident. 
However, the record does not compel that conclusion.  In the grainy in-car
photographs that are contained in the record, although an object resembling a
newspaper is in the front passenger seat, the driver appears to be looking
forward.  In addition, although Chris was found holding a newspaper in his left
hand after the impact, the in-car photograph clearly indicates that the driver=s left hand was empty.  We note, parenthetically, the
medical examiner=s testimony that Chris probably lived for Aa few minutes@
after the collision, during which time he could have picked up the newspaper
that he was later found holding.  Accordingly, the evidence does not
necessarily force the conclusion that Chris was driving while distracted.





            [7]  Thomas suggests
that Ertons failed to investigate the possibility that Chris=s vehicle transversed the median.  To support this
claim, Thomas points to the absence of photographs documenting the condition of
the median north of the impact site, that is, the direction from which Chris=s vehicle came.  However, Ertons testified that he did
examine the median for a distance of 100 feet north of the impact but did not
find any fresh gouge marks.  He did not think it necessary to document, as
through photographs, the absence of any such scratch marks.  As he
explained, AThere was no evidence to put in north of there[.]
Unfortunately, [the photographing officer] did not take a picture farther north
facing southbound; otherwise, that would just dull [appellant=s] argument . . . because I saw for myself there was
no evidence north of that scene.@ 
Thus, we hold the evidence permitted Ertons to conclude that Chris did not
cross the concrete median before the impact.  For the same reason, we also
reject Thomas=s complaint that Ertons failed to examine the
underside of Chris=s vehicle for the presence of scratch marks that, she
contends, might show that Chris=s vehicle
crossed over the median.





            [8] The scale diagram
includes a notation that is the target of Thomas=s objection.  A vehicle position, assigned the notation A2,@ represents
Chris=s vehicle at some indeterminate point in time before
the vehicles collided.  Vehicle A2@ appears well north of the impact scene, and is
unencumbered by any specific measurements.  The absence of any such
measurements appears to be part of Thomas=s
complaint.  That is, because vehicle A2@ has no associated measurements, Thomas argues that
its location on the diagram is the product of Amere conjecture.@  Thus, she insists that Saenz, in calculating vehicle
speed, should not have used any of the measurements from the diagram.

 

However, the testimony indicates that
Saenz did not rely on the hypothetically-placed vehicle A2@ in rendering
his speed calculations.  Instead, the only scale-diagram data that he claimed
to use were the measurements themselves, and vehicle A2@ has no such
measurements.  Ertons explained that, by placing vehicle A2@ on the
diagram, he simply meant to indicate that Chris was driving in the innermost of
the two southbound lanes.  Otherwise, vehicle A2@ carries no significance on the diagram, and could
have been omitted without changing anything meaningful about the scale diagram
or the opinions generated from it. 





            [9]  The full
WinCrash report was not included in the record.





            [10]  Saenz=s testimony on this point was as follows:

 

Q.  Does the WinCrash Data Program allow for an
angular momentum formula?

A.  Yes.

Q.  And it wasn=t
used in this case?

A.  It is used.

Q.  Well, we see in this case that there was a linear
momentum result, correct?

A.  I understand what you=re saying.  I=ll
agree with you.

 

(Emphasis added.)





            [11]  (Capitalization
normalized.)  Because Thomas pleaded guilty to the negligent acts charged
against her, her plea was admissible as a judicial admission in the civil case
arising from the same transaction.  See Johnston v. Am. Med. Int=l, 36 S.W.3d
572, 578 (Tex. App.CTyler 2000, pet. denied); Lillie Sales, Inc. v.
Rieger, 437 S.W.2d 872, 874 (Tex. Civ. App.CTexarkana 1969, writ ref=d
n.r.e.); Barrios v. Davis, 415 S.W.2d 714, 716 (Tex. Civ. App.CHouston 1967, no writ).





            [12]  The record is
unclear as to whether this was a one-time gift of $1,000 or, alternatively,
whether Chris made regular or periodic payments of $1,000 towards Ugochi=s tuition.





            [13]  Chris lived in
Houston and was a student at Texas Southern University while working as a taxi
driver.  He lived with his wife on weekends, as they attended school in
different locations during the week.





            *  Senior Justice J. Harvey Hudson
sitting by assignment.