Opinion issued August 25, 2011

 



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-09-00881-CV

———————————

Continental Casualty Company, Appellant

V.

James E.
Baker, Appellee



 



 

On Appeal from the 80th District Court

Harris County, Texas



Trial Court Case No. 2007-10493

 



 

OPINION ON REHEARING

          Appellee
James E. Baker filed a motion for en banc reconsideration of our May 5, 2011
opinion.  We treat the motion for en banc
reconsideration as a motion for rehearing, grant rehearing, withdraw our May 5,
2011 opinion and judgment, and issue this opinion and judgment in their
place.  The disposition of the case
remains unchanged.

In this workers’ compensation case,
appellant, Continental Casualty Company (“Continental”), brought suit for
judicial review of the decision of the Texas Department of Insurance, Division
of Workers’ Compensation (“Division”) in favor of Baker.  The jury found that Baker’s compensable
injury extended to a left knee meniscus tear identified on an MRI over five
years after his work-related accident. 
The trial court entered judgment in favor of Baker and awarded
$134,694.80 in trial-level attorney’s fees and expenses and $33,500 in
conditional appellate attorney’s fees. 
In six issues, Continental contends that (1) the trial court erred
in giving a charge that included an instruction on additional injuries, an
instruction on aggravation injuries, and an incorrect instruction on producing
cause; (2) the trial court erroneously allowed Baker to present a PowerPoint
presentation displaying excerpts of evidence during opening statements; (3) the
trial court improperly excluded a medical report made to the Division as
hearsay; (4) the trial court improperly allowed Baker’s treating doctor to
testify as an expert regarding causation of the 2005 meniscus tear because he
was not qualified to render such an opinion and his opinions were not
scientifically reliable; (5) factually insufficient evidence supported the
jury’s verdict; and (6) the trial court erroneously determined the amount of
Baker’s reasonable and necessary attorney’s fees, denying Continental its right
to have a jury determine this issue.

          We
reverse the judgment and remand the case for further proceedings.

Background

          On
July 12, 2000, James Baker was injured during the course of his employment when
he stepped off a ladder, lost his balance, and twisted his left knee.  Baker sought workers’ compensation benefits
from Continental, his employer’s insurance carrier.  Continental initially agreed that Baker’s
injury was compensable and accepted the claim; however, it now disputes the
extent of Baker’s injury.  Specifically,
Continental disputes whether the compensable injury includes a tear of the
medial meniscus in Baker’s left knee that was identified in 2005.

          On
July 26, 2000, Baker underwent a magnetic resonance imaging scan (“MRI”) on his
left knee.  The radiologist interpreting
the MRI results preliminarily diagnosed Baker with a “degenerative tear of the
posterior horn of the medial meniscus which reaches both the inferior and
superior articular surfaces.”  Shortly
after this MRI, Baker was examined by Dr. William Woods, an orthopedic surgeon
who specializes in knee surgery.  Dr.
Woods noted that Baker had pre-existing arthritis, a positive McMurray’s test,
which indicated an injury to the inside part of his knee, swelling, and
“numerous loose bodies” of cartilage in the knee.  Before performing arthroscopic surgery on
Baker’s left knee, Dr. Woods tentatively diagnosed Baker with a medial meniscus
tear and articular injury.  He had
observed a “large amount of degenerative change in the meniscus,” which he
stated is sometimes interpreted by radiologists as a tear in the meniscus.  Dr. Woods opined that the only way to confirm
a meniscus tear, as opposed to a degenerative change in the meniscus, is to
examine and probe the meniscus during arthroscopic surgery.

Dr. Woods performed arthroscopic
surgery on Baker in August 2000, but found no visible tear in the
meniscus.  Therefore, he did not operate
on a meniscus tear or perform a partial menisectomy.  Instead, he performed arthroscopic
debridement of the patella, arthroscopic removal of loose bodies, and extensive
arthroscopic partial synovectomy, or surgical removal of a synovial membrane.

Baker returned to work in October
2000, and, in November 2000, Dr. Woods believed that Baker had reached maximum
medical improvement.  Specifically, Dr.
Woods believed that Baker would never have a normally functioning knee and that
he would continue to have knee problems due to his pre-existing arthritis.

          In
March 2001, Baker, who was experiencing continued pain in his left knee,
visited a chiropractor, Dr. David Durkop, for further treatment and physical therapy.  When the pain persisted despite
rehabilitation exercises, Dr. Durkop referred Baker to Dr. Lubor Jarolimek, an
orthopedic surgeon.  In light of Baker’s
continued pain, Dr. Jarolimek ordered a second MRI on Baker’s left knee in May
2001.  This MRI reflected that:  “The anterior horn of the lateral meniscus
has grade II degenerative changes.  There
are also prominent grade II degenerative changes in the posterior horn of the
lateral meniscus.  The anterior horn of
the medial meniscus shows Grade II degenerative changes.  Prominent Grade II changes in the posterior
horn of the medial meniscus.”  The
radiologist interpreting this MRI noted degenerative changes and thinning in
both the anterior and posterior horns of the lateral meniscus, but stated that
“[n]o grade III or IV tears [are] demonstrated.”

          Dr.
Jarolimek continued to treat Baker over the next five years.  Throughout this time period, Baker
continuously displayed pain and tenderness in his left knee.  Dr. Jarolimek ordered a third MRI for Baker
in December 2005, five years after Baker’s injury, first MRI, and surgery, and
four and one-half years after Baker’s second MRI.  This MRI demonstrated a “complex tear of the
body and posterior horn of the medial meniscus. 
No definite lateral meniscal tear is appreciated.”

          Continental
disputed Baker’s assertion that his July 2000 workplace accident caused the
meniscus tear seen on the December 2005 MRI, and it denied further workers’
compensation benefits.  After Continental
and Baker were unable to resolve the dispute at a Benefits Review Conference, a
contested case hearing was held before the Division on October 10, 2006.  The sole issue at the hearing was whether
“the compensable injury extend[ed] to include the left knee meniscus tear
identified on the MRI of December 5, 2005.” 
The hearing officer concluded that the compensable injury extended to
include the meniscus tear identified on the December 2005 MRI.

          After
the Appeals Panel declined to reverse the decision, Continental brought this
suit for judicial review of the hearing officer’s decision.  Baker filed a general denial and asserted a
counterclaim to recover statutory attorney’s fees pursuant to Texas Labor Code
section 408.221(c).

          Before
trial, Continental sought to exclude the expert medical testimony of Dr.
Jarolimek on the grounds that (1) he lacked the necessary qualifications to
render an expert opinion on the cause of the 2005 meniscus tear, (2) his
opinion that Baker had had a meniscus tear since July 2000 that developed into
the tear shown on the December 2005 MRI was not based on an accurate and
reliable foundation, and (3) his alternate opinion, that Baker had an
“intrasubstance tear” in the left knee meniscus that developed into a
full-thickness tear, was based purely on speculation and thus was not
reliable.  The trial court denied this
motion and allowed Dr. Jarolimek’s testimony.

          During
Baker’s opening statement, Baker’s counsel displayed a PowerPoint presentation
that included excerpts from the July 2000 and December 2005 MRI reports, with
the dates of the reports and the radiologist’s interpretations highlighted and
emphasized in boxes on the slides.  The
presentation also contained an excerpt of the hearing officer’s decision, with
its ultimate conclusion highlighted in a box. 
Baker also included excerpts from the video deposition testimony of Nina
Rose, Continental’s corporate representative, Dr. Woods, Dr. Jarolimek, and Dr.
Marvin Van Hal, Continental’s expert witness, in the presentation.

          All
of the doctors testified at trial via video deposition.  Dr. Woods testified that there is a
subjective element to interpreting MRI results, as one radiologist might
interpret a meniscus as having “degenerative thinning” and another radiologist
might interpret the results as a “degenerative tear” in the meniscus.  Dr. Woods stated that actually examining the
meniscus during surgery was the “only way you can really tell if it’s a tear
versus degenerative change.”  When asked
about the three different ways in which Baker’s meniscus was described in the
MRI reports, Dr. Woods opined that they were all different ways of “saying the
same thing.”  Dr. Woods testified that,
when he performed arthroscopic surgery on Baker’s left knee in August 2000, he
did not observe any tears in the meniscus. 
Dr. Woods did not believe that a person could have a meniscus “tear”
that was not visible—he would
instead classify that situation as a “degenerative change,” or damage, to the
body of the meniscus.  In Dr. Woods’
opinion, the damage caused by Baker’s fall included loose pieces of cartilage
and “visible damage to the bone surface,” which he interpreted as aggravation
of Baker’s pre-existing arthritis.  Dr.
Woods agreed that, because he had not seen a meniscus tear when he performed
surgery, there “couldn’t have been a worsening of that tear over time up until
2005.”

          Continental
retained Dr. Marvin Van Hal, an orthopedic surgeon, as its medical expert.  Dr. Van Hal opined that the visual
examination of the meniscus by a surgeon is more accurate than MRI reports due
to the potential for false findings on the MRI. 
Dr. Van Hal testified that based on the subsequent arthroscopic surgery
and the pictures taken during that surgery that demonstrated no meniscus tear, he
believed that the radiologist interpreting the July 2000 MRI made an inaccurate
finding that a meniscus tear existed.  According
to Dr. Van Hal, because “there was no meniscal tear that was there to start
with,” a tear could not propagate and recur. 
Dr. Van Hal opined that the meniscus tear identified in December 2005
“was due to something different than the on-the-job injury of July 12, 2000.”

          On
cross-examination, Dr. Van Hal admitted that he was unable to get access to the
MRI films and that he did not review the pictures taken during the arthroscopic
surgery, although he was able to compare the reports from the three MRIs and
compare the MRI reports to Dr. Woods’s post-operative report.  Dr. Van Hal disagreed that the radiologist
actually found a meniscus tear in 2000, and instead stated that the radiologist
“interpreted it as a meniscus tear.”  When
asked what mechanism could cause the 2005 meniscus tear, other than the
workplace accident, Dr. Van Hal responded that everyday work and life, as well
as physical therapy for the compensable injury, could possibly have caused the
tear.  Dr. Van Hal stated that because it
is unclear what specific exercises Baker did during physical therapy, he could
not rule out the therapy as a cause of the tear.

          Baker
called Dr. Jarolimek, his treating doctor for over five years, as an expert
witness.  Dr. Jarolimek testified that,
in his opinion, Baker’s current meniscus tear was “directly related to his
work-related injury of 2000.”  Dr.
Jarolimek stated that, at the time of the accident, Baker sustained an injury
to his meniscus, and after Dr. Woods performed a partial menisectomy in August
2000, the meniscus tear that existed at that time “continue[d] to propagate”
and developed into the tear identified on the 2005 MRI.  According to Dr. Jarolimek, the fact that
Baker continued to have pain and tenderness in his knee well after he had
arthroscopic surgery suggests that “there still is some type of a problem, a
mechanical problem within the knee, persistent pain or perhaps a recurrent
meniscal tear.”  He opined that the MRI
reports were consistent with the Division’s ruling that the 2005 meniscus tear
was related to the workplace accident because all of Baker’s symptoms and test
results over the years were “consistent with meniscal-type pathology.”

Dr. Jarolimek further testified
that there are different degrees of meniscus tears, including intrasubstance
tears—a tear within the body of
the meniscus—and a tear “do[es] not
necessarily have to be through and through” to be considered a tear.  Baker’s counsel instructed Dr. Jarolimek to
assume that Dr. Woods had not performed a menisectomy in August 2000 and then
asked whether that would change Dr. Jarolimek’s opinion regarding the cause of
the 2005 meniscus tear.  Dr. Jarolimek
responded that his opinion would not change because “a meniscal tear could be
an intrasubstance tear and may propagate and become a full thickness tear
later.”  Dr. Jarolimek testified that,
although the 2001 MRI does not show a “Grade III or IV tear” in the meniscus,
it does show pathology in the meniscus and this result, coupled with the 2000
and 2005 MRIs showing a tear in the same place in the meniscus, indicates that
the torn meniscus has “always been there” since the accident and has not been
addressed.

          On
cross-examination, Dr. Jarolimek admitted that he had taken the board
certification exam in orthopedic surgery twice, but had not passed it.  He also admitted that he had not reviewed the
report or the films from the July 2000 MRI. 
Dr. Jarolimek stated that his understanding from reading the operative
report following Baker’s arthroscopic surgery was that Dr. Woods performed a
menisectomy.  Dr. Jarolimek further
agreed with Continental’s counsel that if a radiologist interpreted an MRI as
showing a meniscus tear, but he did not see a tear while performing
arthroscopic surgery, he would “believe [his] own eyes” over the MRI.

          The
jury charge included only one question, Question No. 1:  “Do you find that the Plaintiff, Continental,
established by a preponderance of the evidence that the compensable injury of
July 12, 2000 does not extend to or include the left knee meniscus tear
identified on the MRI of December 5, 2005?” 
“Compensable injury” was defined as “an injury that arises out of and in
the course and scope of employment for which compensation is payable.  The definition of compensable injury includes
extension injuries.”  “Extension
Injuries” were defined as “injuries occurring in the probable sequence of
events and arising from the actual compensable injury,” and the jury was
informed, “[a]dditional injuries that result from treatment instituted to
relieve or cure the compensable injury are compensable extension
injuries.”  “Injury” was defined as
“damage or harm to the physical structure of the body and a disease or
infection naturally resulting from the damage or harm.”  “Injury” was also separately defined as “also
includ[ing] the excitement, acceleration, or aggravation of any injury,
disease, infirmity or condition, previously or subsequently existing, by reason
of such damage or harm.”

          The
jury was instructed that “the Appeals Panel of the Texas Department of
Insurance: Division of Workers’ Compensation determined that James Baker’s
compensable injury of July 12, 2000 extends to and includes the left knee
meniscus tear identified on the MRI of December 5, 2005.”  It was further instructed that “the burden of
proof is on Continental to prove by a preponderance of evidence that James
Baker’s July 12, 2000 injury was not a producing cause of the meniscus tear
identified on the MRI of December 5, 2005.” 
Finally, it was instructed,

Producing cause is an
efficient, exciting, or contributing cause that, in the natural sequence,
produces the injury, disability or illness in question.  A workplace accident or disease is considered
a producing cause even if it is not a substantial factor in bringing about the
injury, disability, or illness.  In a
workers’ compensation case, there may be more than one producing cause of an
injury.

 

At the charge conference,
Continental objected to the inclusion of extension injuries in the definition
of compensable injury under Question No. 1. 
It proposed that the separate
definition of extension injuries be deleted from the charge and that the
reference to extension injuries be deleted from the definition of compensable
injury.  Continental also objected to
“the last phrase [in the definition] about the additional injuries that result
from the treatment instituted to relieve the compensable injury.”  It argued that the definition was duplicative
of the burden of proof set out in Question No. 1, which required that
Continental prove “by a preponderance of the evidence that the compensable
injury of July 12, 2000 did not extend to or include the left knee meniscus
tear identified on the MRI of December 5, 2005.”  Baker responded, “[T]his is a
proper statement of the law.”  The court
overruled Continental’s objection.

Continental also objected to the
inclusion of four definitions of “injury” in the definitions below Question No.
1 and argued that the correct definition was “danger, harm to the physical
structure of the body, a disease or infection naturally resulting from a damage
or harm.”  It objected that “it’s
incorrect and prejudicial to also say that an injury also includes excitement,
acceleration or aggravation of any injury, disease or infirmity, or condition
previously or subsequently existing for reasons as danger or harm.”  Continental sought a substitute definition,
which would have stated, “The injury also includes the aggravation of any
disease, infirmity or condition previously existing by reason of such damage or
harm.”  The court overruled the
objection.

Finally, Continental objected to
the instruction and definition on producing cause in the general instructions
on the basis that it introduced a producing cause definition separate from the
definition of injury and was confusing.  It
stated, “The standard is whether there’s a direct and natural progression or
cause, or whether a condition is the direct and natural result of a compensable
injury.  The burden is by preponderance
of the evidence.”  It contended that
including a separate instruction on producing cause was “redundant and
prejudicial.”  The court overruled Continental’s
objection.

The jury answered “No” to Question
No. 1.

Baker did not request, and the
charge did not include, a question asking the jury to determine the amount of
his reasonable and necessary attorney’s fees. 
However, after the jury found in favor of Baker, Baker moved for entry
of judgment and for $149,047.16 in trial attorney’s fees and expenses, $1,600
for post-verdict fees and expenses, and $64,000 in conditional appellate fees
to be awarded by the trial court.  Continental
objected to Baker’s recovery of attorney’s fees, contending that he waived such
recovery by failing either to request a jury question on reasonable and
necessary fees or to object to the omission of such a question.  Continental also objected to the trial
court’s determining the amount of attorney’s fees solely by written evidence,
contending that it was entitled to either a jury determination or, at least, a
bench trial on the issue of reasonable and necessary fees.  The trial court overruled both objections,
and after multiple hearings and supplemental motions, ultimately awarded Baker
$134,694.80 for trial attorney’s fees and expenses, $6,071.25 for post-trial
fees, and $33,500 in conditional appellate fees.

Jury Charge Errors

          In
its first issue, Continental contends that the trial court erred in
(1) including an instruction that Baker’s compensable injury encompassed
“extension injuries” resulting from treatment of the original injury because
the issue of extension injuries was not raised by the pleadings or the evidence
and improperly increased its burden of proof; (2) including an instruction that
compensable injury includes the aggravation of a pre- or subsequently-existing
injury because the issue was not raised by the pleadings or the evidence and
including “subsequently existing” was not a proper statement of the law; and
(3) including an instruction on producing cause because producing cause is
irrelevant to disputes over the extent of an injury, producing cause was not
raised by the pleadings, and the trial court’s definition of producing cause
was legally incorrect.

A.              
Standard of Review

The trial court “shall submit such
instructions and definitions as shall be proper to enable the jury to render a
verdict.”  Tex. R. Civ. P. 277. 
An instruction is proper if it (1) assists the jury, (2) accurately
states the law, and (3) finds support in the pleadings and evidence.  Transcon.
Ins. Co. v. Crump, 330 S.W.3d 211, 221 (Tex. 2010) (quoting Union Pac. R.R. Co. v. Williams, 85
S.W.3d 162, 166 (Tex. 2002)).  Generally,
we review the trial court’s decisions on how to charge the jury for an abuse of
discretion; however, when the appellant challenges a definition as legally
incorrect, we review the definition de novo. 
Id.; St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 525 (Tex. 2002).  If the charge is legally correct, the trial
court has broad discretion regarding the submission of questions, definitions,
and instructions.  Hyundai Motor Co. v. Rodriguez, 995 S.W.2d 661, 664 (Tex.
1999).  We therefore review the trial
court’s legally correct definitions and instructions for an abuse of
discretion.  Tex. Workers’ Comp. Ins. Fund v. Mandlbauer, 34 S.W.3d 909, 912
(Tex. 2000).

We will not reverse a judgment for
charge error “unless the error was harmful because it probably caused the
rendition of an improper verdict. . . .”  Crump,
330 S.W.3d at 225 (quoting Columbia Rio
Grande Healthcare, L.P. v. Hawley, 284 S.W.3d 851, 856 (Tex. 2009)).  Charge error is “generally considered harmful
if it relates to a contested, critical issue.” 
Id. (quoting Hawley, 284 S.W.3d at 856).  When determining whether an erroneous
instruction or definition probably caused an improper judgment, we examine the
entire record.  Id. (quoting Quantum Chem.
Corp. v. Toennies, 47 S.W.3d 473, 480 (Tex. 2001)).

To preserve a charge error
complaint for appellate review, a party must “point out distinctly the
objectionable matter and the grounds of the objection.”  Tex.
R. Civ. P. 274.  “Any complaint as
to a question, definition, or instruction, on account of any defect, omission,
or fault in pleading, is waived unless specifically included in the
objections.”  Id.  An objection does not
meet Rule 274’s requirements unless “the defect relied upon by the objecting
party and the grounds of the objection are stated specifically enough to
support the conclusion that [the] trial court was fully cognizant of the ground
of complaint and deliberately chose to overrule it.”  Carousel’s
Creamery, L.L.C. v. Marble Slab Creamery, Inc., 134 S.W.3d 385, 404 (Tex.
App.—Houston [1st Dist.] 2004, pet. dism’d). 
To preserve charge error, the appellant must “clearly designate the
alleged error and specifically explain the basis of its complaint in its
objection to the charge.”  Id. at 404–05; C.M. Asfahl Agency v. Tensor, Inc., 135 S.W.3d 768, 793 (Tex.
App.—Houston [1st Dist.] 2004, no pet.) (“To be sufficiently specific, the
party’s objection must identify the claimed error and explain the basis of the
party’s complaint.”).  We determine
whether a party has preserved a complaint of charge error by “inquiring whether
the party made the trial court aware of the complaint, timely and plainly, and
obtained a ruling.”  C.M. Asfahl Agency, 135 S.W.3d at 793 (citing State Dep’t of Highways & Pub. Transp. v. Payne, 838 S.W.2d
235, 241 (Tex. 1992)).  Objections to the
charge and requests for instructions must comport with the arguments made on
appeal.  Wackenhut Corrections Corp. v. De La Rosa, 305 S.W.3d 594, 616
(Tex. App.—Corpus Christi 2009, no pet.).

B.              
Instruction on Producing Cause

Continental contends that the trial
court erred in including an instruction on producing cause because (1)
producing cause is inapplicable in disputes over the extent of a compensable
injury, (2) a producing cause theory was not raised by the pleadings, and (3) the
definition of producing cause did not contain a “substantial cause” or
“but-for” element and was therefore legally incorrect.  Baker responds that Continental’s issue on
producing cause was not preserved.

The trial court included the
following instruction and definition relating to producing cause in the charge:

You are instructed that the burden of proof
is on Continental to prove by a preponderance of evidence that James Baker’s
July 12, 2000 injury was not a producing cause of the meniscus tear identified
on the MRI of December 5, 2005.

Producing
cause is an efficient, exciting, or contributing cause that, in the natural
sequence, produces the injury, disability or illness in question.  A workplace accident or disease is considered
a producing cause even if it is not a substantial factor in bringing about the
injury disability or illness.  In a
workers’ compensation case, there may be more than one producing cause of an
injury.

(Emphasis added.) 
The charge also included the following definitions related to “injury”:

“Compensable injury” means
an injury that arises out of and in the course and scope of employment for
which compensation is payable.  The
definition of compensable injury includes extension injuries.

 

“Extension Injuries” means injuries occurring
in the probable sequence of events and arising from the actual compensable
injury.  Additional injuries that result
from treatment instituted to relieve or cure the compensable injury are
compensable extension injuries.

“Injury” means
damage or harm to the physical structure of the body and a disease or infection
naturally resulting from the damage or harm.

“Injury” also includes the excitement,
acceleration, or aggravation of any injury, disease, infirmity or condition,
previously or subsequently existing, by reason of such damage or harm.

(Emphasis
added.)

At the charge conference,
Continental made the following objection to the producing-cause instruction and
definition:

Continental:         And the objection, Your Honor, is to
the inclusion of a definition of producing cause.  We believe, to be specific, that including a
producing cause definition is confusing. 
The standard is whether there’s a direct and natural progression or cause,
or whether a condition is the direct and natural result of a compensable injury.  The burden is by a preponderance of the
evidence.  Our objection is inclusion of
a producing cause definition separate from the definition of injury.  And since I’m not proposing an alternate
instruction, I’m not giving you something written to reject, but I’d like the
ruling on the record, please.

 

The
Court:  You say your objection is because
it’s separate from the definition of injury?

 

Continental:         No, because I believe that is inclusive
within the definition of injury and inclusive within other definitions in the
charge, such as the extension definition and the aggravation definition.  I think it’s redundant and prejudicial,
that’s all.

 

Continental thus objected to the
instruction and definition on producing cause on the basis that it was confusing
because “[t]he standard is whether there’s a direct and natural progression or
cause, or whether a condition is the direct and natural result of a compensable
injury,” and that particular standard was already included in the definition of
injury in the charge, so that the additional instruction was redundant and
prejudicial.  It contended, “The correct
definition [of injury] is danger, harm to the physical structure of the body, a
disease or infection naturally resulting from a damage or harm.”

We construe Continental’s objection
to be that the instruction was improper because it did not assist the jury and it
inaccurately stated the law by giving an instruction on producing cause that
conflicted with the definition of a compensable injury as one “naturally
resulting” from a harm.  See Crump, 330 S.W.3d at 221.  Baker
contends, however, that because Continental did not complain at trial regarding
the lack of a substantial factor or but-for component in the producing cause
definition and stated that it was not proposing an alternative definition,
Continental failed to preserve error regarding this definition.  See
Tex. R. Civ. P. 278 (“Failure to
submit a definition or instruction shall not be deemed a ground for reversal of
the judgment unless a substantially correct definition or instruction has been
requested in writing and tendered by the party complaining of the judgment.”).

First, because Continental’s
objection to the producing cause definition was that it should not have been
included at all because it confused an otherwise correct instruction, we
conclude that Continental satisfied its burden of proffering an alternative
charge—one that omitted the
defective definition of producing cause. 
Therefore, we hold that Continental did not fail to preserve error
merely by failing to proffer an alternative definition of producing cause.  We therefore address whether the definition
of producing cause included in the charge was legally incorrect.

Historically, in workers’
compensation cases, “producing cause” did not require the workplace injury to
be a substantial factor in bringing about the employee’s disability.  See,
e.g., Flores v. Emps. Ret. Sys. of
Tex., 74 S.W.3d 532, 549 (Tex. App.—Austin 2002, pet. denied).  While this case was pending on appeal,
however, the Texas Supreme Court, in Crump,
concluded that “[t]he producing cause inquiry in workers’ compensation cases is
conceptually no different from the cause in fact inquiry in negligence cases
and the producing cause inquiry in other substantive contexts.”  330 S.W.3d at 223; see also Ford Motor Co. v. Ledesma, 242 S.W.3d 32, 46 (Tex. 2007)
(holding, in products liability context, that producing cause definition should
include “substantial factor” and “but-for” component).  The supreme court held that “producing cause
in workers’ compensation cases is defined as a substantial factor in bringing
about an injury or death, and without which the injury or death would not have
occurred.”  Crump, 330 S.W.3d at 223. 
The court held that the omission of “but-for” language in the charge
rendered the definition of producing cause submitted to the jury incomplete and
legally incorrect.  Id. at 224–25.  The court
further observed that, because the parties’ respective medical experts
disagreed regarding whether Crump’s workplace accident caused his death, “[t]he
but-for aspect of causation was squarely at issue in [the] case” and the charge
error “‘relate[d] to a contested, critical issue’—indeed, the sole issue—that of
causation.”  Id. at 226.  Because
including a “but-for” component in the producing cause definition “would have
assisted the jury in resolving the disputed expert testimony at the crux of the
case and, more importantly, would have stated the law accurately,” the court
held that the incorrect definition probably resulted in an improper judgment
and, therefore, constituted reversible error. 
Id.

Here, the definition of “producing
cause” in the charge, which Continental sought to have removed, expressly
stated, “A workplace accident or disease is considered a producing cause even
if it is not a substantial factor in
bringing about the injury, disability, or illness” in question in the case.  (Emphasis added.)  This is a legally incorrect definition of
“producing cause” under Crump.  See id.

Both parties acknowledge that, at
the time of the trial, the Texas Supreme Court had not yet issued its opinion
in Crump, and therefore the governing
law was the Fourteenth Court of Appeals’ decision in Crump, which specifically approved of a definition of producing
cause that was similar to the one the trial court submitted here.[1]  See Transcon.
Ins. Co. v. Crump, 274 S.W.3d 86, 100 (Tex. App.—Houston [14th Dist.]
2008), rev’d, 330 S.W.3d 211 (Tex.
2010); see also INA of Tex. v. Howeth,
755 S.W.2d 534, 537 (Tex. App.—Houston [1st Dist.] 1988, no writ) (“It is
enough if [the injury] is ‘a’ cause, even though there were other
causes.”).  Generally, however, a supreme
court decision operates retroactively unless the court exercises its discretion
to provide otherwise.  Bowen v. Aetna Cas. & Sur. Co., 837
S.W.2d 99, 100 (Tex. 1992) (per curiam). 
Thus, when the applicable law changes during the pendency of an appeal,
we must render our decision in light of the change in the law.  Blair
v. Fletcher, 849 S.W.2d 344, 345 (Tex. 1993) (per curiam).

Considering that the parties lacked
the benefit of the supreme court’s decision in Crump at the time of trial, we hold that Continental’s objection to
the definition of producing cause adequately preserved error.  See
Lubbock Cnty. v. Strube, 953 S.W.2d 847, 858 (Tex. App.—Austin 1997, pet.
denied) (holding general objection to submission of question asking jury to
determine attorney’s fees as percentage of recovery sufficient to preserve
error when Arthur Andersen v. Perry Equipment
Corp., prohibiting juries from determining attorney’s fees by awarding
percentage of recovery, was decided during pendency of appeal).

Continental bore the burden of
proving, by a preponderance of the evidence, that Baker’s workplace accident in
2000 was not a producing cause of the left knee meniscus tear observed in
2005.  See Tex. Labor Code Ann. § 410.303
(Vernon 2006); Morales v. Liberty Mut.
Ins. Co., 241 S.W.3d 514, 516 (Tex. 2007) (“[T]he appealing party bears the
burden of proof by a preponderance of the evidence.”).  It is undisputed that the definition of
producing cause submitted to the jury did not include the “but-for” or
“substantial factor” component set out as the standard in Crump.  See 330 S.W.3d at 223–25.  To
the contrary, it correctly instructed the jury that Continental’s burden was
“to prove by a preponderance of evidence that James Baker’s July 12, 2000
injury was not a producing cause of the meniscus tear identified on the MRI of
December 5, 2005.”  But, it then erroneously
instructed the jury that “[a] workplace accident or disease is considered a
producing cause even if it is not a
substantial factor in bringing about the injury, disability or
illness.”  (Emphasis added.)  The Crump
opinion makes it clear that these two standards of proof are in conflict and
that “producing cause in workers’ compensation cases is defined as a
substantial factor in bringing about an injury or death, and without which the
injury or death would not have occurred.” 
330 S.W.3d at 223.  Thus, the
instruction on producing cause was erroneous and confusing to the jury rather
than of assistance to it, and it was, therefore, improper.  See id.
at 221.

As in Crump, the “but-for” or “substantial factor” aspect of causation
was squarely at issue, and the charge error related to the sole issue in the
case, that of causation.  See id. at 226.  Also as in Crump, the evidence in this case included conflicting expert
testimony regarding whether the accident caused the meniscus tear, which was
the sole question before the jury.  See Hawley, 284 S.W.3d at 856 (holding
that charge error is “generally considered harmful if it relates to a
contested, critical issue”); Toennies,
47 S.W.3d at 480 (“An improper instruction is especially likely to cause an
unfair trial when the trial is contested and the evidence sharply conflicting,
as it was in the present case [when the trial court gave an incorrect causation
standard].”).  Because the erroneous and
confusing instruction related to a contested critical issue, it was harmful and
probably caused the rendition of an improper verdict.  See id.
at 226.

Accordingly, we hold that inclusion
of the incorrect producing cause definition in the charge constituted
reversible error.

          We
sustain Continental’s first issue.

          Because
our disposition of this issue is dispositive of the merits of this appeal, we
do not address Continental’s two additional complaints regarding the jury
charge, nor do we reach Continental’s second, third, fourth, fifth, and sixth
issues.




 

Conclusion

          We
reverse the judgment and remand the case to the trial court for further
proceedings consistent with this opinion. 
All pending motions are denied as moot.

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel
consists of Justices Keyes, Sharp, and Massengale.

Justice Sharp, concurring without opinion.

 











[1]
          The trial court submitted the
following definition of producing cause in Crump:  “‘Producing cause’ means an efficient,
exciting, or contributing cause that, in a natural sequence, produces the death
in question.  There may be more than one
producing cause.”  Transcon. Ins. Co. v. Crump, 274 S.W.3d 86, 95 n.9 (Tex.
App.—Houston [14th Dist.] 2008), rev’d,
330 S.W.3d 211 (Tex. 2010).